[Civil No. 546.   Filed March 22, 1901.]

[64 Pac. 427.]

JAMES L. UTTER et al., Plaintiffs, v. BENJAMIN J. FRANKLIN et al., Loan Commissioners of the Territory of Arizona, Defendants.

1. MANDAMUS—OPERATES ON OFFICE—ABATEMENT—CHANGE OF PERSONNEL DOES NOT CAUSE—REVIVOR—NOT NECESSARY AGAINST SUCCESSOR OF OFFICER.—The writ of *mandamus* operates on the office rather than on the individual who occupies the office, and therefore does not abate by a change in the personnel of the office, and no revivor is necessary against a successor of the officer against whom the proceedings were instituted.

2. LEGISLATIVE AUTHORITY—OF CONGRESS—OF TERRITORIAL LEGISLATURE — ORGANIC LAW — PARAMOUNT LAW — WHAT CONSTITUTES— CONSTITUTIONAL LAW—ACTS CONG. JUNE 25, 1890, AUGUST 3, 1894, JUNE 6, 1896, AND REV. STATS. ARIZ. 1887, TIT. 31, AND LAWS ARIZ. MARCH 19, 1891, CITED—LAWS ARIZ. 1899, ACT No. 32, HELD VOID.—Congress having full authority to legislate directly for the territory, and the territorial legislature having only such power as is specifically delegated to it by Congress, whenever the latter legislates upon any subject pertaining to the territory such legislation has the force and effect of a constitutional provision, and becomes a part of the Organic Law, and therefore the act of Congress of June 25, 1890, *supra*, amending, approving, and confirming, "subject to future territorial legislation," Revised Statutes of Arizona, title 31, *supra*, creating a board of loan commissioners for the funding of the existing territorial indebtedness, having been accepted by the territorial legislature by act of March 19, 1891, *supra*, is now the paramount law upon the subject of funding, and becomes a part of the Organic Law, to the extent that it may not be changed so as to render any of its provisions inoperative by any act of the territorial legislature, except with the express consent of Congress, and act No. 32, *supra*, repealing the territorial acts creating such commission is void.

3. STATUTORY CONSTRUCTION—STATUTES NOT IN EXPRESS TERMS REPUGNANT—REPEAL BY IMPLICATION.—When two acts are not in express terms repugnant, yet if the latter act covers the whole subject of the former, and embraces new provisions, plainly showing that it is intended as a substitute for the first act, it will operate as a repeal of that act.

4. COUNTY BONDS — REFUNDING — GOOD FAITH — RAILROAD CONSTRUCTION—MANDAMUS—LAWS ARIZ., ACT FEB. 21, 1883, ACTS CONG., JUNE 25, 1890, AND JUNE 26, 1896, CITED AND CONSTRUED.—The Territorial Act of February 21, 1883, *supra*, authorized Pima

County to issue bonds in the amount of two hundred thousand dollars, to be exchanged for bonds of a railroad, thereafter to be constructed, in the following manner: Fifty thousand dollars when the company was organized, and a like amount "so often as each five miles of said railroad shall have been graded, laid with ties and iron," the proof the work having been performed to be the certificate of the county surveyor. The company was organized and ten miles of the road graded and laid with ties and iron, and one hundred and fifty thousand dollars in bonds were issued to the company according to the terms of the act. Work on the road was thereafter abandoned, the road was never completed, nor was any payment either of interest or principal made by the county upon the bonds. The act of Congress of June 6, 1896, *supra,* having provided that all outstanding bonds of the territory and counties thereof which had been sold or exchanged in good faith in compliance with the terms of the acts of the legislature by which they were authorized should be funded in accordance with the act of Congress of June 25, 1890, creating a board of loan commissioners, whose duty it was to provide for the redeeming and refunding of the territorial or county indebtedness by the issuance of bonds therefor, and *mandamus* being brought to compel the loan commissioners to fund the bonds of Pima County issued to the railroad company: *Held,* that the exchange of bonds was not rendered fraudulent by the fact that the railroad had not been completed, the issuance and payment not being dependent upon completion, and that the bonds should therefore be funded.

AFFIRMED.  186 U. S. 95; 46 L. Ed. 1070, *sub nom. Murphy* v. *Utter.*

ORIGINAL APPLICATION for Writ of Mandamus .

Barnes & Martin, for Plaintiffs.

Congress has complete control over the territories. Const., art. IV, sec. III, subd. 2.

The organic act under which a territory is organized takes as to the territory the place taken by a constitution, and an act of the territorial legislative assembly derives its legal force and validity from such organic act.  25 Am. & Eng. Ency. of Law, 956.

On the ground that the legislature had legislated beyond the limitations placed upon the legislative power by Congress the above act was held to be void. For want of legislative power delegated by Congress, the act was held to be *ultra vires.* To cure this defect Congress passed the act of June 6, 1896. This law is retrospective, and intended so to be. It declares that all bonds, warrants, and other evidences of in-

debtedness heretofore funded are hereby declared to be valid and legal and all bonds and other evidences of indebtedness *heretofore* issued under the authority of the legislature of said territory *are hereby confirmed, approved, and validated.*

If Congress had power to enact such a law, then the act validates said bonds.

As said above, Congress has full power to legislate for the territories. It may do so directly, or may create a legislative assembly with power to legislate. Having done the latter, its supreme power is not lost.

As was said by the supreme court of the United States, in *First National Bank* v. *Yankton,* 101 U. S. 129, "There was no express reservation of power in Congress to amend the acts of the territorial legislature, but none was necessary. Such a power is an incident of sovereignty, and continues until granted away. Congress may not only abrogate laws of the territorial legislatures, but may itself legislate directly for the local government. It may make a void act of the territorial legislature valid, and a valid act void. In other words, it has full and complete legislative authority over the people of the territories and all departments of the territorial government."

In the case of *Insurance Co.* v. *Bales of Cotton,* 1 Pet. 543, Justice Marshall, in 1828, speaking for the court, decided that the power of Congress to legislate for the territories "is unquestioned," and the case of *Dred Scott* v. *Sanford,* 19 How. 633, sustains this doctrine. *Doucheneau* v. *House,* 10 Pac. 839.

*New Orleans* v. *Clark,* 95 U. S. 644. Bonds issued were invalid because the city had exceeded the power by law to issue them. The question presented was, "Whether it was competent for the legislature of Louisiana to legalize the issue of the bonds, if for any cause they were originally invalid." The court answers in the affirmative, saying: "The books are full of cases where claims, just in themselves, but which from some irregularity or omission in the proceeding by which they were created could not be enforced in the courts of law, have been thus recognized and their payment secured."

The legislature may direct a municipal corporation to apply funds arising from taxation in payment of a claim that could not be enforced at law.

"The legislative authority is only limited by constitutional provisions." *Mount* v. *State,* 90 Ind. 29, 46 Am. Rep. 192.

The constitution has made no such limitation upon the power of Congress to legislate for the territories.

In *Rogers* v. *Keokuk,* 154 U. S. 546, 14 Sup. Ct. 1162, the court treats the question in a very summary manner. The opinion is short, cites no authority, and treats the matter as a settled question, and says in a few words that the legislature having power to authorize a municipal corporation to subscribe for stock in a railway company, that the act in question gave validity to the bonds issued, notwithstanding any informality or illegality in their issuing. Other cases are *Randall* v. *Krieger,* 23 Wall. 137; *St. Joseph* v. *Rogers,* 16 Wall. 666; *Thomson* v. *Lee County,* 3 Wall. 327; *Beloit* v. *Morgan,* 7 Wall. 619; *City* v. *Lamson,* 9 Wall. 485; *Campbell* v. *Kenosha,* 5 Wall. 195; *Marsh* v. *Fulton County,* 10 Wall. 676; *Otoe County* v. *Baldwin,* 111 U. S. 1, 4 Sup. Ct. 265; *Thompson* v. *Perrine,* 103 U. S. 806; *Dows* v. *Elmwood,* 34 Fed. 114; *Grenada* v. *Brogden,* 112 U. S. 261, 5 Sup. Ct. 125; *Jasper County* v. *Ballou,* 102 U. S. 745; *McMillen* v. *Dubuque,* 1 Wall. 220; *State* v. *Hoffman,* 35 Ohio St. 437; *Dentzel* v. *Waldie,* 30 Cal. 145; *People* v. *Supervisors,* 20 Mich. 104; *May* v. *Holbridge,* 23 Wis. 97; *Brewster* v. *Syracuse,* 19 N. Y. 116; *Kunkel* v. *Franklin,* 13 Minn. 127, 97 Am. Dec. 226; *Stuart* v. *Warren,* 37 Conn. 225; *McMillan* v. *Boyce,* 6 Iowa, 330; *Board* v. *Bright,* 18 Ind. 83; *Gibbon* v. *Railroad Co.,* 46 Ala. 410; *Thomas* v. *Leland,* 24 Wend. 65; *Weister* v. *Hade,* 52 Pa. St. 474; *Johnson* v. *Campbell,* 49 Ill. 316.

This proceeding was begun against the board of loan commissioners of the territory of Arizona. The fact that some of the persons who were loan commissioners at the time the suit was begun have ceased to be such does not affect the proceeding.

Speaking with reference to the writ of *mandamus* the supreme court of the United States (103 U. S. 480) says (p. 483) : "The proceedings may be commenced with one set of officers and terminated by another, the latter being bound by the judgment." See, also, Dillon on Municipal Corporations, 4th Ed., sec. 861b; *Leavenworth County Commrs.* v. *Sellew,* 99 U. S. 624; *People* v. *Collins,* 19 Wend. 56; *Warner Valley Stock Co.* v. *Smith,* 165 U. S. 28, 17 Sup. Ct. 225.

C. W. Wright, and Rochester Ford, for Appellee.

SLOAN, J.—The plaintiffs, December 31, 1896, filed their petition in this court, which prayed for a writ of mandate to compel the defendants, who were then, respectively, governor, auditor, and secretary of the territory, and who, by virtue of holding said offices at the date of the filing of said petition, were the loan commissioners of the territory, to fund the bonds, and the interest due thereon, issued by Pima County in aid of the Arizona Narrow-Gauge Railroad Company under the provisions of a territorial act of February 21, 1883. The defendants demurred to the petition, and, by way of answer, set up that the bonds sought to be funded, in the suit of Lewis against Pima County, by the district court of said Pima County, were declared to be void and of no binding obligation upon the said county; that the judgment of the district court was, upon appeal, affirmed by the supreme court of the territory, and on appeal from the judgment of this court the latter was affirmed by the supreme court of the United States; that the judgment so rendered and affirmed in the Lewis case was *res adjudicata* and binding upon the plaintiffs in this suit. The records of this court in the present case show that the demurrer to the petition was sustained, and the petition dismissed, whereupon an appeal was taken to the supreme court of the United States. The latter court reversed the judgment of this court, and remanded the cause "for further proceedings not inconsistent with the opinion." *Utter* v. *Franklin*, 172 U. S. 424, 19 Sup. Ct. 183, 43 L. Ed. 498. In the opinion the supreme court held that the judgment in the case of Lewis, holding that the bonds were invalid because the territorial legislature had no authority to authorize their issuance under the organic law, "was *res adjudicata* only of the issues then presented, of the facts as they then appeared, and under the legislation then existing"; that the act of Congress of June 6, 1896, cured this defect, and validated the territorial act of February 21, 1883, and made it the duty of the loan commissioners to fund the bonds in question. Upon the filing of the mandate of the supreme court in this court, the defendants asked leave to file an amended return raising new issues of fact, and setting up that the bonds in question were "not sold or exchanged in good faith and in

compliance with the act of the legislature by which they were authorized,'' and so were not of the class of bonds validated by the act of June 6, 1896, and required to be funded thereby. Leave to file this amended return was granted for the reason that the record in this court, where the cause originated, discloses that the judgment of this court from which the appeal was taken to the supreme court of the United States was rendered upon the issue of law raised by the demurrer, and not upon any issue of fact raised by the original return. We took the view that in the state of the record the mandate of the supreme court reversing the cause, and remanding it to this court "for proceedings not inconsistent with the opinion," made it our duty to consider and decide any issue of fact, properly pleaded, which amounts to a defense, and which is not in fact decided by the supreme court in passing upon the issue of law presented by the demurrer; that, under the law and practice regulating appeals of this character, such a mandate, being general in its terms, is to be construed as justifying this court in considering and deciding any question left open by the mandate and opinion of the appellate court. *Ex parte Union Steamboat Co.,* 178 U. S. 318, 20 Sup. Ct. 904, 44 L. Ed. 1084. The issue of fact raised by the amended return, and which, in our view, was left open by the opinion and mandate of the supreme court, involves the question as to whether the bonds were exchanged by the county of Pima for the bonds of the Arizona Narrow-Gauge Railroad Company in good faith, and in compliance with the act of the territorial legislature of February 21, 1883. Upon the order permitting the defendants to file their amended return being made, a commissioner was appointed to take and report the testimony which the parties might desire to put in bearing upon the new issue of fact raised by the amended return. The evidence has all been taken, and is now before us. The defendants now present two objections to the granting of the writ of mandate which arise out of facts that did not exist at the time the case was heard in this court on the demurrer. These are: 1. That the action was begun against Benjamin J. Franklin, governor, C. P. Leitch, auditor, and C. M. Bruce, secretary, and that each of the defendants has long since been superseded in office by another person, and that therefore the action should abate; and 2.

That the loan commission has ceased to exist, by repeal of the statute creating the same, and no provision was had in the repealing statute reserving from its operation pending proceedings, and that therefore the action must abate, because there is no officer or person upon whom the duty rests to fund the bonds in question, or against whom the writ of mandate may be enforced.

Upon the first point raised we deem it sufficient to say that the weight of authority in the state courts is in favor of the view that the writ of *mandamus* operates on the office, rather than on the individual who occupies the office, and therefore does not abate by a change of personnel in the office, and that no revivor is necessary against a successor of the officer against whom the proceedings were instituted. This also appears to be the rule as followed in the supreme court of the United States whenever a proceeding is to enforce a continuing duty against a corporation or municipality. *Thompson* v. *United States,* 103 U. S. 482, 26 L. Ed. 521; *Commissioners* v. *Sellew,* 99 U. S. 624, 25 L. Ed. 333. The loan commissioners were, by the statute creating the board, made a continuing body, and the delinquency complained of related to a continuing duty of the commission; and we see no reason why the doctrine as applied in the above cases does not apply to the present proceeding. *Ex parte Parker,* 131 U. S. 221, 9 Sup. Ct. 708, 33 L. Ed. 123.

The question as to whether the loan commission has been abolished is one which involves a consideration of not only the repealing statute, but, as well, the various acts, congressional and territorial, relating to the creation of the commission, its duties, and the general subject of funding. In the Revised Statutes of 1887 there was incorporated, as title 31, an act which provided for the creation of a commission to be known as the "Loan Commissioners," and the funding by this commission of the outstanding and existing indebtedness of the territory. This commission was to be composed of the governor, auditor, and secretary of the territory. Congress, by the act of June 25, 1890, amended the territorial act in important particulars, and then "approved and confirmed" the same, "subject to future territorial legislation." The territorial legislature, construing the clause "subject to future territorial legislation" to mean that Congress, having

taken up the territorial act of 1887 and amended it before making it binding and operative upon the territory, chose to confer upon the latter the privilege of consenting to or disapproving of its provisions, by its act of March 19, 1891, supplemented the congressional act by additional provisions intended to more perfectly carry out its provisions, and in the first section declared that the latter act should "be and the same is hereby now re-enacted as of the date of its approval." The language used in the territorial act indicates that the territorial legislature intended to approve of the congressional act and accept its provisions, under the permission granted and expressed in the clause "subject to future territorial legislation." Whether this construction was primarily right or not, it has been subsequently followed by the legislative assembly of the territory and acquiesced in by Congress. Congress, by the act of August 3, 1894, amended section 15 of the act of June 25, 1890, by extending its provisions so as to permit the funding of additional indebtedness. When the next legislature convened after the passage of the congressional act just mentioned, construing, as did its predecessor, the clause "subject to future territorial legislation" to mean that the congressional act should only become operative when accepted by the territory through its general assembly, by act approved March 19, 1895, ratified and confirmed the objects, purposes, and provisions of the congressional act. In the congressional act of August 3, 1894, and in the curative act of Congress of June 6, 1896, the act of Congress of June 25, 1890, is referred to; and no mention is made of a re-enactment of the same by the territorial legislature, which is significant, as indicating that Congress recognized the act of June 25, 1890, as having become operative, and as continuing in force, and as constituting the existing law upon the subject of funding. Congress having full authority to legislate directly for the territory, and the territorial legislature having only such power as is specifically delegated to it by Congress, whenever the latter legislates upon any subject pertaining to the territory such legislation has the force and effect of a constitutional provision, and becomes a part of the organic law. Had the clause "subject to future territorial legislation" not appeared in the act of June 25, 1890, unquestionably the act would have become immediately operative, without the consent or ac-

quiescence of the territory; and no subsequent legislation by the territorial legislature would have been needed to give it effect, or could in any way affect its provisions. In the light of the contemporaneous construction placed upon the clause "subject to future territorial legislation" by the legislature of the territory, and in view of the fact that Congress thereafter invariably referred in subsequent legislation to the act of Congress of June 25, 1890, and made no mention of any re-enactment of the same by the territory, and considering the relation which the territory sustains to Congress, we are led to the conclusion that the act of June 25, 1890, is now to be construed as having been accepted in accordance with the permission granted to accept or refuse the same, and, having been accepted, is now the paramount law upon the subject of funding, and becomes a part of the organic law, to the extent, at any rate, that it may not be changed so as to render any of its provisions inoperative by any act of the territorial legislature, except with the express consent of Congress.

The repealing statute which we have referred to (being act No. 32 of the Laws of 1899) reads as follows: "That paragraph 2039, section 1, chapter 1, title XXXI, of the Revised Statutes of the territory of Arizona; also that section 1 of act No. 79, Session Laws of the sixteenth legislative assembly of the territory of Arizona; also act No. 33 and act No. 74, Session Laws of the eighteenth legislative assembly of the territory of Arizona, are hereby repealed." Paragraph 2039, referred to in this act, was reincorporated as the first section of the congressional act of June 25, 1890, and reads as follows: "For the purpose of liquidating and providing for the payment of the outstanding and existing indebtedness of the territory of Arizona, the governor of the said territory, together with the territorial auditor and the territorial secretary and their successors in office, shall constitute a board of commissioners to be styled the loan commissioners of the territory of Arizona, and shall have and exercise the power and perform the duties hereinafter provided." Act No. 79, referred to, is the act of March 19, 1891. Act No. 33 and act No. 74, sought to be repealed by the act, do not pertain to the creation of the board of loan commissioners, and their consideration is not important in this connection. The act of Congress of June 25, 1890, covered the

whole field of the previous territorial legislation upon the
subject of funding, and included such new legislation as to
clearly indicate the intent that it should take the place of the
territorial act of 1887. When two acts are not in express
terms repugnant, yet if the latter act covers the whole subject
of the former, and embraces new provisions, plainly showing
that it is intended as a substitute for the first act, it will
operate as a repeal of that act. *United States* v. *Tynen,* 11
Wall. 88, 20 L. Ed. 153. The act of Congress, being revisory
in its terms, embracing new provisions, and covering the whole
subject of funding, supplemented and thereby repealed the
territorial statute of 1887. As repeals by implication are not
favored, the repeal of the first section of the statute of 1887
can, therefore, have no effect to repeal the similar provision
of the act of June 25, 1890. Again, by the attempted repeal
of the first section of the act of March 19, 1891, which, as we
have seen, provided, in terms, "that the act of Congress
entitled 'An act approving, with amendments, the funding
act of Arizona approved June 25, 1890,' be and the same is
hereby now re-enacted as of the date of its approval," the
intent of the legislature is uncertain, in that it is not made
evident whether the repeal of said section is to be construed
as an attempt to repeal the whole, or only a part, of the
congressional act, if it can possibly be construed as tending
to either result. It can hardly be construed as an attempt
to repeal the whole of the act of June 25, 1890, inasmuch as
the other sections of the act of March 19, 1891, were excepted
from the repealing act, and these were supplemental to the
congressional act. If the repealing of section 1 of the law of
1891 be construed as a repeal of only a part of the act of
June 25, 1890, how, then, can the court give it effect by de-
claring what portion of said act it was designed and intended
to affect? Irrespective, therefore, of the question of the
power of the territorial legislature to repeal the congressional
act creating the loan commission, it is more than doubtful if
the act of 1899 can be construed so as to effect that result.

Mr. Justice Brown, in the opinion delivered in this case in
the supreme court, construing the act of Congress of June
6, 1896, said: "The first section of the act requires the fund-
ing of all outstanding obligations of said territory and its
municipalities, and all outstanding bonds, etc., of the territory

and its municipalities, 'heretofore authorized by legislative enactment of said territory, bearing a higher rate of interest than is authorized by the aforesaid funding act, approved June 25, 1890,' which said bonds, etc., 'have been sold or exchanged in good faith in compliance with the terms of the acts of the legislature by which they were authorized'; and the second section confirms, approves, and validates all bonds and other evidences of indebtedness theretofore issued under the authority of the legislature, and authorized to be funded by the first section, and declares that they may be funded as in this act provided, until January 1, 1897.'' As we have said, therefore, under the opinion of the supreme court, and its mandate, as well as under the terms of the act of June 6, 1896, we are limited, under the issues of fact raised by the amended return, to the inquiry as to whether the bonds in question ''have been sold or exchanged in good faith in compliance with the terms of the acts of the legislature by which they were authorized.'' The first two sections of the act of February 21, 1883, read as follows:—

''Section 1. Upon information in writing to the chairman of the board of supervisors of Pima County, Arizona Territory, by the president of the Arizona Narrow-Gauge Railroad Company, the corporation of that name which filed its articles of association with the secretary of said territory on the 23d day of November, A. D. 1882, that said railroad company is ready to exchange bonds with the said county of Pima, according to the provisions of this act, it shall be the duty of said chairman, and he is hereby directed to call a meeting of said board, to be held within five days after the receipt of said notification, and it shall be the duty of said board of supervisors, and they are hereby directed to meet within five days, at the county seat of said county, and then and there to order issued two hundred thousand dollars of bonds of said county, in denominations of one thousand dollars each, and bearing interest at the rate of seven per cent per annum, interest payable semiannually, the principal payable in twenty years, which said bonds, and the interest coupons thereto attached, shall be signed by said chairman and the clerk of said board, and shall, within thirty days after the said order of issuance thereof has been made, be delivered by the clerk of said board to the county treasurer of said county of Pima, to be by him

disposed of as hereinafter provided, and said county treasurer shall receipt to the said clerk for the said bonds.

"Sec. 2. Upon the application of said railroad company to the said treasurer, and the tender by said company of fifty thousand dollars of the first mortgage bonds of said company in like denominations, bearing like interest and payable in like time as those of said county, it shall be the duty of said treasurer and he is hereby directed to deliver fifty thousand dollars of bonds of said county to the president and secretary of said railroad company, in exchange for fifty thousand dollars of the first mortgage bonds of said railroad company, so tendered as above provided. And whenever and so often as each five miles of said railroad shall have been graded, laid with ties and iron, said treasurer shall upon proof thereof, which proof shall be the certificate of the county surveyor to that effect, exchange with the said president and secretary of said railroad company fifty thousand dollars of said bonds of said Pima County for fifty thousand dollars of said bonds of said company, for each five miles so completed, until the two hundred thousand dollars of bonds of said Pima County are exchanged for a like number of bonds of said railroad company."

It is to be noted that under the provisions of these sections of the statute the bonds of the county were to be exchanged for the bonds of the railroad company under the condition therein provided, and it does not provide for a sale of the same. It is also to be noted that of the issue of two hundred thousand dollars of the bonds of the county, called for by the act, fifty thousand dollars was to be exchanged upon the organization of the company, and upon notice to the county of the company's readiness to exchange a like amount of bonds the county was to deliver to the company bonds to the amount of fifty thousand dollars; that a like amount was to be delivered by the county treasurer to the company in exchange for a like amount of railroad bonds whenever the county surveyor should certify that five miles of the company's railroad had been graded and laid with ties and iron, and thereafter, upon the completion of an additional five miles of said railroad as provided, the county treasurer, upon proof thereof by the certificate of the county surveyor to that effect, should exchange a like amount of county bonds

for the same amount of railroad bonds, until the full issue ($200,000) of the county bonds had been exchanged for a like amount of railroad bonds. Under the act, therefore, the question is narrowed to the inquiry as to whether each provision of the statute relating to the exchange of bonds was complied with by the railroad company, on the one part, and the officers of the county, on the other. The records of the board of supervisors of Pima County show that on the twenty-sixth day of April, 1883, W. H. Culver, president of the Arizona Narrow-Gauge Railroad Company, addressed a letter to James H. Toole, chairman of the board of supervisors of Pima County, notifying the latter that the Arizona Narrow-Gauge Railroad Company was ready to exchange its bonds for the bonds of the county in accordance with the provisions of the act of February 21, 1883. On May 5, 1883, as it appears in the minutes of the board, an order was made that two hundred thousand dollars of bonds of the county be issued, and be placed in the hands of the county treasurer, upon the condition expressed that the Arizona Narrow-Gauge Railroad Company execute a bond to the county in the sum of five hundred dollars, conditioned that if the county bonds were not exchanged in accordance with the provisions of the act of February 21, 1883, the said railroad company would repay to said county all expense incurred in the issuance of said bonds. A receipt was introduced in evidence, dated August 3, 1883, and signed by one J. C. Elliott, then county treasurer, acknowledging the receipt from the clerk of the board of supervisors of the county of two hundred bonds, of the denomination of one thousand dollars each, to be issued to the Arizona Narrow-Gauge Railroad Company as provided by law. It appears in evidence that the first exchange as provided by the act, of fifty thousand dollars county bonds for a like amount of railroad bonds, was made at some date during the year 1883. This is shown by the record in an action brought by a taxpayer of the county against the board of supervisors and the county treasurer in the district court of Pima County during the latter part of the year 1883 to restrain the latter from accepting the bonds of the Arizona Narrow-Gauge Railroad Company in exchange for the bonds of the county. It is also shown that these (bonds to the amount of) fifty thousand dollars were delivered during

the year 1883 to the railroad company by the county, by the minute entry of the board of supervisors, showing the action of the board taken with reference to an application filed June 16, 1884, by the railroad company, and an offer by the railroad company to return to the county fifty thousand dollars of county bonds and accept in full payment therefor county warrants of the face value of $22,500. It appears from the evidence that prior to the year 1886 the railroad company had expended in the construction of the road not to exceed twelve thousand dollars; that during that year the railroad company entered into a contract with one W. W. Walker wherein the latter undertook to complete the road in accordance with the act of the legislature and original intent of the company; that under this contract the county bonds held by the railroad company were turned over to Walker. It further appears that Walker represented the firm of Coler & Co., bankers and brokers of New York City; that under the Walker contract said Coler & Co. transmitted to the Bank of Tucson, for the building of the road, $52,900.40; that there was graded, and laid with ties and rails, ten miles of road by Walker under his contract; and that thirty miles in all was graded. It also appears that when the first five miles of road had been built the county treasurer turned over to Walker, for Coler & Co., under their contract with the railroad company, fifty thousand dollars of county bonds in exchange for a like amount of railroad bonds, and that subsequently, upon the completion of the ten miles of road, a like exchange was made of an additional fifty thousand dollars. George J. Roskruge testified that in 1886 he was county surveyor of Pima County, and examined the railroad constructed by the Arizona Narrow-Gauge Railroad Company; that he measured the road on two occasions, and found upon the first that there was five miles graded, laid with ties and rails, and upon the second found that there was ten miles of road graded and laid with ties and rails, and gave his certificate to the county treasurer upon both occasions, in the language of the act of February 21, 1883, stating the facts as he found them. It further appears that there was graded under the Walker contract in the neighborhood of thirty miles of road, but only the first ten miles of the road was ever laid with ties and

rails; that for various reasons Walker or Coler & Co. either were unable to, or chose not to, complete the road. The records of the board of supervisors show that in 1887 an agreement was entered into between the railroad company and Walker, on the one part, and the board of supervisors and the county treasurer, on the other part, whereby it was agreed that the county should sell to the railroad company and Walker one hundred and fifty thousand dollars of railroad bonds held by the county, to said railroad company for twenty-five cents on the dollar, and to receive in payment the bonds of the county at par; and the railroad company and Walker agreed to build and put into operation sixty miles of said road, and secure the majority of the trade of the town of Globe for the city of Tucson. There were other provisions in the contract relating to the exchange of the remaining fifty thousand dollars of county bonds held by the treasurer in exchange for a like amount of bonds of the railroad, and the sale of the latter to the railroad company upon the same terms as were provided in the contract for the bonds already exchanged. It further appears that this agreement was not complied with on the part of the railroad company or Walker, and that on July 23, 1890, the board of supervisors made an order, and transmitted the same to the county treasurer, directing the latter to cancel the remaining fifty thousand dollars of county bonds held by him. It further appears from the evidence in the case that nothing has ever been paid by the county in the way of interest upon bonds of the county delivered to the railroad company.

Do these facts show that the bonds in question are included among those required by the act of Congress of June 6, 1896, to be funded? It must be conceded that the county of Pima derived little or no benefit from the building of the few miles of the Arizona Narrow-Gauge Railroad. However, there can be no question, under the proof, that the terms of the act of February 21, 1883, were fully complied with, both on the part of the county and, as well, on the part of the railroad company, in the matter of the issuance and exchange of the bonds, to the extent that the legislative act specifically provided. There was nothing in evidence showing bad faith on the part of the railroad company, in so far as the first exchange of bonds was concerned; nor is there any evidence

which shows bad faith on the part of the company, or its contractor, Walker, and his principals, Coler & Co., except their failure to continue the building and equipment of the road after the completion of the thirty miles of grading and laying of ten miles of track, except such inferences as may be drawn from the fact that both the railroad company and Coler & Co. had difficulty in raising the money for the payment of the work done, and did not have the resources to go on and complete the work. Can the court say that notwithstanding the fact that the bonds were exchanged in compliance with the terms of the act of February 21, 1883, they are invalid, and not within the provisions of the act of Congress of June 6, 1896, because subsequent to their issue the original holders of those bonds failed to complete the railroad, and the county of Pima thereby received no benefit from the same? The question of a failure of consideration is to be distinguished from that of an exchange of bonds in good faith under the act of June 6, 1896, unless the failure of consideration was due to a failure on the part of the holders of the bonds to comply with the provisions of the act authorizing their issuance. The legislative act was exceedingly liberal in its terms, and contained no safeguard against the failure of the railroad company to build or operate the road. The only provision looking to the protection of the county was the one which required a certificate of the county surveyor showing that each five miles of the road was graded and laid with ties and iron, as a condition precedent to the exchange of each fifty thousand dollars of county bonds for a like amount of railroad bonds. As the supreme court has held in this case, Congress by the act of June 6, 1896, has validated the territorial act of February 21, 1883. And as the latter did not make the completion of the road a condition precedent to the issuance of the bonds, nor make their validity dependent upon the subsequent conduct of the railroad company, bad faith cannot be predicated of the transaction, so long as there was not only a substantial compliance, but a literal as well, with the requirements of the act under which they were issued. We are forced to the conclusion, therefore, that no facts have been shown under the amended return which would warrant us in holding that the bonds in question were excluded from the provisions of the act of June 6, 1896, but, on the contrary,

find that it is our plain duty, under the decision of the supreme court construing said congressional act, and mandatory upon us, to issue the writ of mandate prayed for, requiring the loan commissioners to fund the bonds in question, together with the interest due thereon, under the provisions of the act of June 25, 1890.

Street, C. J., Doan, J., and Davis, J., concur.