## SCHUERMAN v. ARIZONA.

APPEAL FROM THE SUPREME COURT OF THE TERRITORY OF ARIZONA.

No. 151. Submitted January 28, 1902.—Decided March 3, 1902.

The act of Congress of June 6, 1896, c. 339, 29 Stat. 262, authorizing the refunding of outstanding obligations of the Territory of Arizona, was within the power of Congress to pass, and by it the bonds therein described were made valid.

Under the territorial funding act of Arizona, approved March 19, 1891, it was sufficient for the holder of the bonds to make the demand for the exchange, and it was not necessary that the demand should be made by the municipal authorities.

It was the intent of Congress under the said act of June 6, 1896, to provide that there should be no funding of bonds or other indebtedness which arose subsequently to January 1, 1897; and the statute was not intended to limit the mere process of exchanging one bond for the other to the time specified.

The territorial statute of Arizona of 1887 is the foundation for the appointment of the loan commissioners; and the body thus created comes directly within its provisions.

THIS is an appeal by the defendants below from a judgment of the Supreme Court of the Territory of Arizona affirming a judgment of the district court granting a mandamus. Upon the trial of the case certain facts were agreed upon, in susbtance, that the defendants were the supervisors of the county of Yavapai, and that prior to the year 1890 the county of Yavapai had issued what were known as railroad bonds in aid of the Prescott and Arizona Central Railroad Company, upon which there was due on the 17th of September, 1897, $260,218.80, and on that day they were received in exchange by the board of loan commissioners, who thereupon issued 258 funding bonds of the Territory, each of the denomination of one thousand dollars, and bearing interest at the rate of five per centum per annum, payable semi-annually. On the 18th of November, 1896, the board of supervisors of defendant county requested the board of loan commissioners to fund the bonds issued for the aid of the railroad company, but the board subsequently and on December 5, 1896, rescinded such request before it had been acted upon, and on the 17th of September, 1897, the holders of the bonds requested the board of loan commissioners to refund the same, which they did upon such demand. The statement of facts then continues as follows:

"5. At the meeting of said board of loan commissioners at which said bonds were funded, only two members of said board were present or acted; the third member of said board of loan commissioners was at the time of said meeting absent from the Territory of Arizona, and took no part in the funding of said bonds, and was not in any manner consulted with relation thereto.

"6. On January 15, 1898, there became due and payable as interest on the 258 territorial funding bonds issued in exchange for the bonds of said Yavapai County as aforesaid, the sum of $4288.33 according to the tenor of said territorial funding bonds, and thereafter on the 15th days of July and January of each year there became due and payable as interest on said territorial funding bonds, according to the tenor thereof, the sum of $6450.00, payable at the office of the territorial treasurer of the Territory of Arizona.

"7. In compliance with the terms and conditions of said territorial funding bonds the territorial treasurer of said Territory of Arizona has paid all the interest thereon at the times when the same became due and payable, amounting in all at the date hereof to the sum of $23,638.33, and has taken up and cancelled interest coupons attached to said bonds to that amount."

"9. Save as aforesaid, no demand was ever made by the board of supervisors of said Yavapai County for the funding of said P. & A. C. Railroad bonds, and no notice was ever given to said board of supervisors at or about the time of the funding that said bonds had been funded.

"10. For the year 1899 the territorial board of equalization of said Territory, at its annual session for that year, levied the sum of thirty-seven cents on each one hundred dollars of valuation of the taxable property in said Yavapai County, for the purpose of paying interest on the funded indebtedness of said county of Yavapai, including the interest on the territorial funding bonds aforesaid maturing in the year 1900, and the territorial auditor duly certified the levy of said tax to the board of supervisors of said Yavapai County, that the defendants, comprising the board of supervisors of said county, failed and neglected to levy said tax of thirty-seven cents on the hundred dollars, but only levied the sum of six cents on the hundred dollars for the purpose of paying interest on the funded indebtedness of said county ; said sum of six cents on the hundred dollars was sufficient to pay the interest on all the funded indebtedness of said county other than the territorial funding bonds issued in lieu of said P. & A. C. Railroad bonds as aforesaid, but was insufficient to pay the interest on said territorial funding bonds or any part thereof.

"11. The above mentioned P. & A. C. Railroad bonds were originally issued by the county of Yavapai in aid of the construction of the Prescott & Arizona Central Railroad, a line of railway running from Prescott Junction or Seligman to Prescott, Arizona, and were granted and issued as a subsidy to the corporation building and owning said railroad."

The county having refused to levy any taxes for the purpose of collecting money to pay any of the interest maturing on the

bonds of the Territory given in exchange for the bonds issued by the county, this proceeding was undertaken to compel the board of supervisors to levy a tax in accordance with the provisions of the statute, for the purpose of paying the interest which had been paid by the Territory on the bonds.

*Mr. Reese M. Ling* for appellants.

*Mr. C. F. Ainsworth* for appellee.

MR. JUSTICE PECKHAM, after stating the above facts, delivered the opinion of the court.

It is claimed on the part of the defendants below that the railroad bonds for which the territorial bonds were given were invalid when issued, and it is only by reason of the passage of the act of June 6, 1896, 29 Stat. 262, that any action could be sustained to enforce their payment. That act has been held to be within the power of Congress to pass, and that by it the bonds therein described were made valid. *Utter* v. *Franklin,* 172 U. S. 416.

Three grounds are now urged why the judgments of the lower courts should be reversed. They are:

(1) That the railroad bonds were illegally funded, without any demand having been made by the board of supervisors of Yavapai County upon the territorial loan commission for such funding.

(2) That said bonds were funded after January 1, 1897, and at a time when the board of loan commissioners were by the terms of the statute without power to fund them.

(3) That the bonds were improperly and illegally funded at a meeting of the board of loan commissioners of the Territory of Arizona, at which only two members of the said board were present, the third member being absent from the Territory and not in any manner consulted with reference to such funding.

(1) In regard to the first ground, the Supreme Court of the Territory has held that it was not necessary that a demand should be made by the municipal authorities, but that the

holders of the bonds could themselves make it by virtue of section 7 of the territorial funding act of Arizona, approved March 19, 1891. Act No. 79, p. 120. The seventh section of that act reads as follows:

"Sec. 7. Any person holding bonds, warrants or other evidence of indebtedness of the Territory, or any county, municipality or school district within the Territory, existing and outstanding on the 31st day of December, 1890, may exchange the same for the bonds issued under the provisions of this act at not less than their face or par value, and the accrued interest at the time of exchange; but no indebtedness shall be redeemed at more than its face value and any interest that may be due thereon."

Where a holder of bonds had made the demand it was held sufficient under that section. *Bravin* v. *Mayor*, 56 Pac. Rep. 719; *Yavapai County* v. *McCord*, 59 Pac. Rep. 99.

This construction of the territorial act by the Supreme Court of Arizona we think was correct, and that it was not necessary in order to obtain a refunding of the bonds that the demand for the same must be made by the municipal authorities.

(2) It appears from the records that the bonds were funded after January 1, 1897, and it is objected that there was no power on the part of the board of loan commissioners to fund such bonds after that date.

The act of Congress under which this question arises was approved June 6, 1896, 29 Stat. 262, chap. 339, and is set forth in the margin.[1]

---

[1] Chap. 339. An act amending and extending the provisions of an act of Congress entitled "An act approving with amendments the funding act of Arizona," approved June twenty-fifth, eighteen hundred and ninety, and the act amendatory thereof and supplemental thereto approved August third, eighteen hundred and ninety-four.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That the provisions of the acts of Congress approved June twenty-fifth, eighteen hundred and ninety, and August third, eighteen hundred and ninety-four, authorizing the funding of certain indebtedness of the Territory of Arizona, are hereby amended and extended so as to authorize the funding of all outstanding obligations

The Supreme Court of Arizona has decided this contention against the defendants upon the authority of its previous decisions in *Gage* v. *McCord*, 51 Pac. Rep. 977, decided in 1898, which was approved in *Yavapai County* v. *McCord*, 59 Pac. Rep. 99, decided in November, 1899. In the first mentioned case the following is that portion of the opinion which discusses this particular objection :

" Stress is put upon the clause ' until January first, eighteen hundred and ninety-seven,' found in section 1 of the act, as bearing out the view that the purpose and intent of Congress was to limit the time within which the loan commissioners might act, and to require the completion of the work of funding, by the sale and disposition of bonds and the liquidation of the indebtedness allowed by this and prior acts to be funded,

---

of said Territory, and the counties, municipalities and school districts thereof, as provided in the act of Congress approved June twenty-fifth, eighteen hundred and ninety, until January first, eighteen hundred and ninety-seven, and all outstanding bonds, warrants and other evidences of indebtedness of the Territory of Arizona, and the counties, municipalities, and school districts thereof, heretofore authorized by legislative enactments of said Territory bearing a higher rate of interest than is authorized by the aforesaid funding act approved June twenty-fifth, eighteen hundred and ninety, and which said bonds, warrants and other evidences of indebtedness have been sold or exchanged in good faith in compliance with the terms of the acts of the legislature by which they were authorized, shall be funded, with the interest thereon, which has accrued and may accrue until funded into the lower interest bearing bonds, as provided by this act.

SEC. 2. That all bonds and other evidences of indebtedness heretofore funded by the loan commission of Arizona under the provisions of the act of Congress approved June twenty-fifth, eighteen hundred and ninety, and the act amendatory thereof and supplemental thereto approved August third, eighteen hundred and ninety-four, are hereby declared to be valid and legal for the purposes for which they were issued and funded; and all bonds and other evidences of indebtedness heretofore issued under the authority of the legislature of said Territory, as hereinbefore authorized to be funded, are hereby confirmed, approved and validated, and may be funded, as in this act provided, until January first, eighteen hundred and ninety-seven: *Provided*, That nothing in this act shall be so construed as to make the government of the United States liable or responsible for the payment of any of said bonds, warrants or other evidences of indebtedness by this act approved, confirmed and made valid, and authorized to be funded.

Approved, June 6, 1896.

by January 1, 1897. Even were we restricted to the more literal meaning of the words used in construing remedial statutes of this kind, the narrow and circumscribed view thus taken of the statute can hardly be justified if regard be had to the whole of the statute, including the plain purpose of the act as expressed in its title. In the latter, it is clearly stated to be an amendment of previous statutes, and the extension and enlargement of their provisions. Again, an analysis of the body of the act bears out the view that, instead of the purpose being to limit or restrict the exercise of any powers, rights or privileges previously granted, the legislative will was to add to, extend and enlarge these. The first section contains two general provisions—one authorizing the amendment and extension of the Congressional acts approved, respectively, June 25, 1890, and August 3, 1894, so as to include in their provisions ' all outstanding obligations' of the Territory; the other directing the funding of all outstanding' bonds, warrants and other evidences of indebtedness of the Territory, as well as of the counties, municipalities and school districts thereof, which had been authorized by legislative enactments, and which bore a higher rate of interest than is authorized by the funding law, and which had been sold or exchanged in good faith. The second section likewise has reference to two classes of indebtedness, both of which are recognized obviously so as to confirm, approve, validate and effectually fix their status as binding obligations upon the Territory.

" The acts of June 25, 1890, and August 3, 1894, being referred to, we must therefore consider the act of June 6, 1896, *in pari materia* with the former. The former act confirmed and approved, with amendments, chapter 1, tit. 31, Rev. Stat., passed by the territorial legislature March 10, 1887. These amendments had reference to the rate of interest, the time bonds issued for funding purposes should run, and as to what indebtedness might be funded ; the act being amended in this particular so as to include county, municipal and school indebtedness. Congress added to the legislative enactment a provision that in effect validated a class of obligations otherwise invalid, because incurred in violation of the organic law of the Terri-

tory, as found in the ' Harrison Act,' and provided for the funding of all the then existing and outstanding indebtedness, and that which might thereafter be evidenced by warrants issued for the necessary and current expenses of carrying on territorial, county, municipal and school government for the the year ending December 31, 1890, and added to the foregoing the declaration that thereafter no warrants, certificates or other evidences of indebtedness should be allowed to issue or be legal when the same is in excess of the limit prescribed by the Harrison Act. The act of August 3, 1894, provided ' that an act entitled " An act approving, with amendments, the funding act of Arizona," approved June twenty-fifth, eighteen hundred and ninety, and paragraph twenty-two hundred and fifty-two (section 15) of said act, be and the same is hereby amended by adding thereto as follows : " Provided, further, however, that the present outstanding warrants, certificates and other evidences of indebtedness issued subsequent to December thirty-first, eighteen hundred and ninety, for the necessary and current expenses of carrying on the territorial government only, together with such warrants as may be issued for such purpose for the years ending December thirty-first, eighteen hundred and ninety-four, and December thirty-first, eighteen hundred and ninety-five, may also be funded and bonds issued for the redemption thereof ; and thereafter no warrants, certificates or other evidences of indebtedness shall be allowed to issue, or to be legal where the same is in excess of the limit prescribed by the Harrison Act." ' It is to be noted that, in both the acts referred to, the only limitation imposed had reference to the class of obligations which were permitted to be funded, and did not in any manner restrict the territorial officers in the method of their procedure previously prescribed by the territorial law, or limit the time within which the acts of funding, by the sale and disposition of bonds, might lawfully be done. Bearing in mind the remedial character of this legislation, and reading the act of June 6, 1896, in the light of the previous Congressional enactment upon the same subject-matter, we construe the former act to express only what obviously appears to be the Congressional intent, viz.,

to extend and enlarge the class of obligations which may be funded, and not to limit the time within which the board of loan commissioners might complete the acts of funding indebtedness, which has expressly been recognized by Congress as fundable. We therefore read section 1 of this act as authorizing the funding of all obligations of the Territory which existed and were outstanding prior to January 1, 1897, and not as limiting the sale and disposition of bonds for funding purposes by the loan commissioners to the absurdly short period of six months for the successful accomplishment of the funding of the varied class of obligations validated and recognized by the act as fundable, and which necessarily amounted to large sums. It is not to be assumed that Congress would in one breath grant liberal and generous concessions, and in the next breath take away their practical benefits by the imposition of a seemingly unreasonable and unnecessary restriction, and thus defeat its own purpose and intent. It is to be noted that no contention is made that any of the indebtedness proposed to be funded by the sale and disposition of the bonds in question has been incurred since January 1, 1897, but the sole contention is as to the time within which the funding of the territorial indebtedness as limited by law may be done."

We are disposed to agree with the conclusions arrived at by the territorial Supreme Court. While it may be said that by the strict letter of the statute of 1896 there could be no funding of a bond after January 1, 1897, although the bond had been issued long prior to that date and represented an indebtedness of the county, which was provided for by the act of 1896, yet taking into consideration the series of acts which have been passed and the provisions made therein relating to the funding of the indebtedness of the Territory and of the various counties and other municipal divisions therein, we think the intent of Congress was to provide that there should be no funding of bonds or other indebtedness which arose subsequently to January 1, 1897, the date named in the statute, and that date was named as the limit of the indebtedness that could be refunded, and the statute was not intended to limit the mere process of exchanging one bond for the other to the time speci-

fied. There was no special reason for a limitation of time for the mechanical exchange of bonds under the statute, so long as the time was limited which applied to the indebtedness to be recognized.

Although bonds executed by many counties in favor of railroads had been held invalid because the acts of the legislature of Arizona permitting the counties to issue such bonds were violations of the restrictions imposed upon the territorial legislature by Congress, *Lewis* v. *Pima County,* 155 U. S. 54, yet the legislative assembly of the Territory of Arizona had adopted a memorial asking Congress to pass such curative legislation in regard to such bonds as would protect the bondholders, when such bonds had been issued under the authority of the acts of the territorial legislature. A copy of the memorial is to be found in the report of the case of *Utter* v. *Franklin,* 172 U. S. 416, 421.

It was, therefore, the desire of the Territory of Arizona to have the bonds validated, and that they should be paid and to pay them. We think it quite plain that the second section of the Federal statute of June 6, 1896, was passed in response to the request of the legislature of Arizona. When these bonds were validated by such statute it would seem hardly reasonable that the short period of six months from June 6, 1896, to January 1, 1897, should be given not alone for their presentation and exchange, but also for all the indebtedness mentioned in that act; while, on the contrary, having made all such bonds valid, it would seem to be quite reasonable that the limitation of time provided for in the Federal act referred to the character of indebtedness which was to be limited and not to the particular time when the bonds were actually to be exchanged.

It is to be noted that by the acts prior to that of June 6, 1896, there was no limit whatever placed upon the time for the board of loan commissioners to act upon the funding of the indebtedness of the Territory, but the limitation was in regard to the time when the debts which were to be refunded were created. The only limit named in the act of Congress of June 25, 1890, chap. 614, 26 Stat. 175, was as to the date when the indebtedness was created. Section 7 of the territorial act of March 19,

1891, it will be perceived, did not limit the date of refunding, but did limit the indebtedness to that which was existing or outstanding on December 31, 1890. By the act of Congress approved August 3, 1894, chap. 200, 28 Stat. 224, the time for the creation of debts of the Territory which might be funded was extended from December 1, 1890, to December 31, 1895, which was over a year beyond the date of the passage of the act, but the time of refunding was not limited.

In none of these acts, as stated, was there any limitation as to the time of refunding, but the limitation in each was in regard to the indebtedness which was to be refunded. Upon consideration of all the circumstances existing when the various acts of Congress were passed, we are inclined to concur with the Supreme Court of Arizona on the construction it has placed upon the act of Congress of 1896. While we admit that it is against the strict letter of the statute, we think the construction adopted is within its clear meaning and intention.

(3) The last objection raised to the validity of the funding, is that the bonds were improperly and illegally funded at a meeting of the board of loan commissioners of the Territory of Arizona, at which only two members of the board were present, the third member being absent from the Territory, and not in any manner consulted with reference to the funding.

There is a statute of Arizona (Revised Statutes, par. 2932, subdivison 2) which reads as follows: "All words purporting to give a joint authority to three or more public officers or other persons shall be construed as giving such authority to a majority of such officers or other persons, unless it shall be otherwise expressly declared in the law giving the authority."

The objection is made that the loan commissioners of Arizona obtained their authority from the act of Congress and not from the territorial legislature, and hence the statute above referred to does not apply. The Territory of Arizona passed an act in 1887 known as the Revised Statutes, in which was "Title XXXI, Funding." That act, by paragraph 2039, created the governor of the Territory, together with the territorial auditor and the territorial secretary, and their successors in office, a board of commissioners to be styled the "Loan Commissioners of the

Territory of Arizona," who should have and exercise the powers
and perform the duties provided for in the act, which gave them
power to provide for the payment of the existing territorial in-
debtedness and such future indebtedness as might be authorized
by law, and granted them power to issue negotiable coupon
bonds of the Territory under the conditions named in the act.
This act was somewhat amended and then approved by Con-
gress June 25, 1890, 26 Stat. 175. The powers of the commis-
sioners have been extended from time to time. It is claimed
that the power vested in them came from Congress instead of
the territorial legislature and that therefore the statute relating
to the exercise of powers given to a board of public officers
does not apply.

We think that the territorial statute, although approved by
Congress, is the foundation for the appointment of the loan com-
missioners, and that the body thus created comes directly within
the provisions of the Arizona statute just referred to. Upon
this subject it was said by the Supreme Court of Arizona as
follows :

" There is no provision in the funding act of 1887, as amended
by Congress in 1890, that the commissioners should jointly act,
but the board was treated as a unit. The funding act is not a
strictly Congressional act; it is a territorial act, passed by the
legislature of the Territory and embodied in the Revised Statutes
of 1887. For the purpose of assuring the validity of the act,
and of placing any issuance of bonds under it beyond dispute,
the act was presented to Congress for its affirmative approval,
which it gave with some few amendments, generally verbal in
their nature and evidently for the purpose of making the act
more specific. The title of the act passed by Congress clearly
carries out that view, for the first provision of that act is ' that
the act of the Revised Statutes of Arizona of 1887, known as
title XXXI, "funding," be and is hereby amended so as to read
as follows : and that as amended the same is hereby approved
and confirmed, subject to future territorial legislation.' The
act being a territorial act, and the commission being the crea-
tion of the Territory, is directly affected by par. 2932, *supra.*"

The record does not show that the absent commissioner had

not been notified to attend the meeting at which the bonds were funded. It is not to be presumed that notice of the intended meeting was not given. Under the provisions of the territorial act, the proceedings of the board of loan commissioners were legal.

We think the three objections made by the appellants are untenable, and the judgment of the Supreme Court of Arizona was right, and must be

*Affirmed.*