# MURPHY v. UTTER.

APPEAL FROM THE SUPREME COURT OF THE TERRITORY OF ARIZONA.

No. 388. Argued March 7, 10 1902.—Decided May 19, 1902.

By an act passed in 1887 the territorial legislature of Arizona constituted a Board of Loan Commissioners for the purpose of refunding the territorial indebtedness. In 1890, Congress passed an act approving and confirming the territorial act of 1887, "subject to future territorial legislation." This act was a repetition of the territorial act with a few immaterial changes and an additional section. *Held :* that the territorial act of 1887 was repealed by the act of 1890, and that the Board of Loan Commissioners still continued in existence, notwithstanding that the territorial legislature in 1899 repealed that portion of the act of 1887 constituting such board.

*Held,* also, that the act of 1890 which declared the territorial act of 1887 to be "subject to future territorial legislation," was intended to authorize such new regulations concerning the funding act as future exigencies

might seem to require; but that it did not authorize the legislature to repeal the Congressional act of 1890.

*Held*, however, that it recognized the right of the territorial legislature to enact such legislation as should be in furtherance and extension of the main object of the act of 1890, whereby the power of refunding territorial indebtedness might be extended to the indebtedness of counties, municipalities and school districts.

*Held*, also, that even if the act of 1890 did not operate as a repeal of the territorial act of 1887, it was still a separate and independent act which it was beyond the power of the territorial legislature to repeal, and that the office of Loan Commissioners continued by that act, was not terminated by the repealing act of 1899.

*Held*, also, that a petition for a mandamus was a "proceeding taken" within the meaning of section 2934 of the Revised Statutes of Arizona, providing that the repeal of a statute does not affect any action or proceeding theretofore taken.

The fact that the members of the Board of Loan Commissioners were changed between the time the petition for a mandamus was filed and the time when a peremptory writ was granted, did not abate the proceeding. The board must be treated as a continuing body without regard to its individual membership, and the individuals constituting the board at the time the peremptory writ is issued may be compelled to obey it.

As it was decided in *Utter* v. *Franklin*, 172 U. S. 416, that it was made the duty of the Loan Commissioners to fund the bonds in question, it was *held* that, if the defendant could be permitted to set up any new defences at all without the leave of this court, it could not set up objections to the validity of bonds, which existed and were known to the Loan Commissioners at the time the original answer was filed, and before the case of *Utter* v. *Franklin* was heard or decided by this court.

THIS was an appeal by the Loan Commissioners of Arizona from a judgment of the Supreme Court of that Territory rendered March 22, 1901, granting a peremptory writ of mandamus and commanding such Loan Commissioners, upon the tender by plaintiffs of $150,000 bonds of the county of Pima with coupons attached, described in the petition, to issue and deliver to the petitioners refunding bonds of the Territory pursuant to certain acts of Congress.

The facts of the case are substantially as follows : By an act of the legislature of Arizona of February 21, 1883, the county of Pima in that Territory was authorized to issue $200,000 of bonds in aid of the construction of the Arizona Narrow Gauge Railroad Company, to which company the bonds were made payable. The entire issue was declared to be void by this court

in *Lewis* v. *Pima County*, 155 U. S. 54.  This decision was pro-
nounced in October, 1894.

Prior to this decision, however, owing to doubts that were
entertained as to the validity of bonds issued in aid of railroads,
the legislature of Arizona in 1887 and Congress in 1890 passed
certain acts authorizing the refunding of territorial bonds,
which had been authorized by law, and in compliance with a
memorial submitted by the legislature of Arizona, Congress
passed a further act in 1896 authorizing the refunding of all
outstanding bonds of the Territory, and its municipalities, which
had been authorized by legislative enactments, and also confirm-
ing and validating the original bonds, which by the first section
were authorized to be refunded.

Thereupon, and on December 31, 1896, James L. Utter and
Elizabeth B. Voorhies filed the petition involved in this case
for a writ of mandamus to compel the Loan Commissioners to
issue refunding bonds in exchange for those originally issued
by the county of Pima in aid of the Narrow Gauge Railroad
Company.  Defendants demurred to the petition, and for an-
swer thereto averred that the bonds of Pima County, held by
the petitioners, had been declared both by the Supreme Court
of the Territory and by this court to be void, and therefore
that the petition should be dismissed.  They also interposed a
plea of *res adjudicata*.  The petition being denied by the Su-
preme Court of Arizona, the relators appealed to this court,
which reversed the order of the Supreme Court of the Terri-
tory, and remanded the case to that court for further proceed-
ings.  *Utter* v. *Franklin*, 172 U. S. 416.  This decision was
made in January, 1899.

Thereupon, and on June 1, 1899, after the case was remanded
to the Supreme Court of Arizona, respondents, by leave of the
court, filed an amended return to the effect that the bonds and
coupons sought to be refunded were not delivered by any one
authorized by Pima County to do so; that the county never
acknowledged the validity of the bonds or paid interest thereon;
that the railroad, the construction of which the legislature in-
tended to promote, by the issue of the bonds, was never con-
structed, equipped or operated; that Pima County never re-

ceived any consideration whatever for the bonds; that they had been declared void by this court; that petitioners were not innocent-holders of them; that the bonds and coupons were not sold or exchanged in good faith, and in compliance with the act of the legislature by which they were authorized, and that they were not intended to be included, and were not included, in the act of Congress of 1896, or any act or memorial of the legislative assembly of the Territory. The return also set up the statute of limitations; that the personnel of the Loan Commission had been wholly changed; that the act authorizing the employment of Loan Commissioners had been repealed and no longer existed, and numerous defences which had not been made or set up in the original answer or return.

Petitioners thereupon moved to strike the amended return from the files on the ground that the same had been filed without leave of the court, and that under the decision of this court in *Utter* v. *Franklin* no new defences could be considered. The Supreme Court of the Territory, however, overruled the motion and permitted the amended return to be filed, to which ruling petitioners excepted. But instead of applying to this court for a writ of mandamus to carry its mandate into effect, they proceeded with the case in the Supreme Court of the Territory, and filed a reply to the amended return. A referee was appointed, testimony taken and the Supreme Court of the Territory made a finding of facts set out in the record, and awarded a peremptory writ of mandamus directing the refunding of the bonds. From this judgment defendants appealed to this court.

Meantime, however, Elizabeth B. Voorhies, one of the petitioners, had died, and her executors were ordered by this court to be substituted.

*Mr. Rochester Ford* and *Mr. John G. Carlisle* for appellants.

*Mr. John F. Dillon* for appellees.

MR. JUSTICE BROWN delivered the opinion of the court.

While upon the former hearing of this case, under the name of *Utter* v. *Franklin,* 172 U. S. 416, the order of the Supreme

Court of Arizona denying a writ of mandamus was reversed and the case remanded for further proceedings, we expressed the opinion "that it was made the duty of the Loan Commissioners by these acts to fund the bonds in question." The logical inference from this was that a writ of mandamus should issue at once. True, the case was argued upon demurrer, but as the demurrer was accompanied by a plea of *res adjudicata,* which was expressly held to be untenable, (page 424,) it is a serious question whether the defendant should have been permitted to set up new defences without the leave of this court. *In re Potts,* 166 U. S. 263, 267; *Ex parte Union Steamboat Co.,* 178 U. S. 317; *Supervisors* v. *Kennicott,* 94 U. S. 498; *New Orleans* v. *Warner,* 180 U. S. 199, 203; *Stewart* v. *Salamon,* 94 U. S. 434; *Gaines* v. *Rugg,* 148 U. S. 228. The reason for such a course applies with special cogency to this case in view of the statute of Arizona, (Rev. Stat. 1887, sec. 734,) declaring that the "defendant in his answer may plead as many several matters, whether of law or fact, as may be necessary for his defence, and which may be pertinent to the cause, but such pleas shall be stated in the following order and filed at the same time: 1. Matters denying the jurisdiction of the court. 2. Matters in the abatement of a suit. 3. Matters denying the sufficiency of the complaint, or of any cause of action therein, by demurrer, general or special. 4. Matters of counterclaim and set-off."

Of the numerous defences upon the merits set up in the amended return, but two are pressed upon our attention, namely, whether the petition abated by a change of the personnel of the Loan Commission, or by a repeal of the act abolishing the commission altogether.

1. The court was correct in holding that the change in the personnel of the commission did not abate the proceeding, which was not taken against the individuals as such, but in their official capacity as Loan Commissioners. The original petition was entitled and brought by Utter and Voorhies, plaintiffs, against "Benjamin J. Franklin, C. P. Leitch and C. M. Bruce, Loan Commissioners of the Territory of Arizona," and the prayer was for a writ of mandamus requiring the defend-

ants, "acting as the Loan Commissioners of the Territory," to
issue the refunding bonds.

The question when a suit against an individual in his official
capacity abates by his retirement from office has been discussed
in a number of cases in this court, and a distinction taken be-
tween applications for a mandamus against the head of a de-
partment or bureau for a personal delinquency, and those
against a continuing municipal board with a continuing duty,
and where the delinquency is that of the board in its corporate
capacity.    The earliest case is that of *The Secretary* v. *McGarra-
han*, 9 Wall. 298, which was a writ of mandamus against Mr.
Browning, then Secretary of the Interior, in which it appeared
that Mr. Browning had resigned some months before the deci-
sion of the court was announced.   It was held that the suit
abated by his resignation, because he no longer possessed the
power to execute the commands of the writ, and that his suc-
cessor could not be adjudged in default, as the judgment was
rendered against him without notice or opportunity to be heard.
The same question was more fully considered in *United States*
v. *Boutwell*, 17 Wall. 604, in which it was held that a manda-
mus against the Secretary of the Treasury abated on his death
or retirement from office, and that his successor could not be
brought in by way of amendment or order of substitution.
Said Mr. Justice Strong: "But no matter out of what facts or
relations the duty has grown, what the law regards and what it
seeks to enforce by a writ of mandamus is the personal obliga-
tion of the individual to whom it addresses the writ.   If he be
an officer, and the duty be an official one, still the writ is aimed
exclusively against him as a person, and he only can be pun-
ished for disobedience.   The writ does not reach the office.   It
cannot be directed to it.   It is, therefore, in substance a per-
sonal action, and it rests upon the averred and assumed fact
that the defendant had neglected or refused to perform a per-
sonal duty, to the performance of which, by him, the relator
has a clear right. . . .   It necessarily follows from this that
on the death or retirement from office of the original defendant,
the writ must abate in the absence of any statutory provision
to the contrary.   When the personal duty exists only so long

as the office is held, the court cannot compel the defendant to perform it after his power to perform has ceased. And if a successor in office be substituted, he may be mulcted in costs for the default of his predecessor, without any delinquency of his own." This language has evidently but an imperfect application to a case where the delinquency is not personal but official, and the action is not that of an individual but of a body of men in their collective capacity.

These were followed by *Warner Valley Stock Co.* v. *Smith*, 165 U. S. 28, wherein a bill in equity against the Secretary of the Interior and the Commissioner of the General Land Office, by their personal names, to restrain them from exercising jurisdiction with respect to the disposition of certain public lands, and to compel the Secretary to issue patents therefor to the plaintiff was held to abate, as to the Secretary, upon his resignation from office, and could not afterwards be maintained against the Commissioner alone.

In *United States ex rel. Bernardin* v. *Butterworth*, 169 U. S. 600, it was held that a suit to compel the Commissioner of Patents to issue a patent abates by the death of the Commissioner, and cannot be revived so as to bring in his successor, although the latter gives his consent. See also *United States* v. *Chandler*, 122 U. S. 643; *United States* v. *Lamont*, 155 U. S. 303; *United States* v. *Lochren*, 164 U. S. 701.

It was doubtless to meet the difficulties occasioned by these decisions that Congress on February 8, 1899, passed an act, 30 Stat. 822, to prevent the abatement of such actions.

We have held, however, in a number of cases, that if the action be brought against a continuing municipal board it does not abate by a change of personnel. Thus, in *Commisssoners* v. *Sellew*, 99 U. S. 624, which was an application for a mandamus against a board of county commissioners and its individual members to compel them to levy a tax to pay a judgment, it was held that the action would lie, though the terms of the members had expired, and the case of *Boutwell* was distinguished upon the ground that the county commissioners were "a corporation created and organized for the express purpose of performing the duty, among others, which the relator seeks

to have enforced. The alternative writ was directed both to the board in its corporate capacity and to the individual members by name, but the peremptory writ was ordered against the corporation alone." Said the Chief Justice : "One of the objects in creating such corporations, capable of suing and being sued, and having perpetual succession, is that the very inconvenience which manifests itself in *Boutwell's* case may be avoided. In this way the office can be reached and the officer compelled to perform its duties, no matter what changes are made in the agents by whom the officer acts. The board is in effect the officer, and the members of the board are but the agents to perform such duties. While the board is proceeded against in its corporate capacity, the individual members are punished in their natural capacities for failing to do what the law requires of them as the representatives of the corporation."

This was followed by *Thompson* v. *United States*, 103 U. S. 480, which was a petition for a mandamus to compel the clerk of a township to certify a judgment obtained by the relator against the township, to the supervisor, in order that the amount thereof might be placed upon the tax roll. It was held that the proceeding did not abate by the resignation of the clerk upon the appointment of his successor; citing *People* v. *Champion*, 16 John. 60, and *People* v. *Collins*, 19 Wend. 56. See also *In re Hollon Parker*, 131 U. S. 221.

We think these cases control the one under consideration and that they are clearly distinguishable from the others. The Loan Commission of Arizona was originally created by an act of the territorial legislature of 1887, Laws of 1887, chap. 31, the first section of which reads as follows :

"2039 (Sec. 1). For the purpose of liquidating and providing for the payment of the outstanding and existing indebtedness of the Territory of Arizona, the governor of the said Territory, together with the territorial auditor and territorial secretary, and their successors in office, shall constitute a board of commissioners, to be styled the Loan Commissioners of the Territory of Arizona, and shall have and exercise the powers and perform the duties hereinafter provided."

Congress, by an act approved June 25, 1890, reënacted this statute substantially *verbatim*. 26 Stat. 175. As the members of this commission and their successors in office were constituted a Loan Commission for the express purpose of liquidating and providing for the payment of the outstanding indebtedness of the Territory, and subsequently by the act of Congress of 1896, 29 Stat. 262, of its counties, municipalities and school districts, we think it must be treated as a continuing body, without regard to its individual membership, and that the individuals constituting the board at the time the peremptory writ was issued may be compelled to obey it. As we said in *Thompson's* case, 103 U. S. 480, "the proceedings may be commenced with one set of officers and terminate with another, the latter being bound by the judgment."

It is true the Loan Commissioners were not made a corporation by the act constituting the board, but they were vested with power, and were required to perform a public duty ; and, in case of refusal, the performance of such duty may be enforced by mandamus, under section 2335 of the Revised Statutes of Arizona of 1887, which provides that "the writ of mandamus may be issued by the Supreme or District Court to any inferior tribunal, corporation, *board* or person, to compel the performance of an act which the law especially enjoins." As, under the act of Congress, as well as the territorial act, the board was made a continuing body with corporate succession, the fact that it is not made a corporation by name is immaterial.

2. Respondents, however, relied largely upon the fact that as the Loan Commission of Arizona was abolished prior to the judgment of the Supreme Court in this case, there are now no persons upon whom the duty rests to fund the bonds in question, or against whom the writ of mandamus can go. There is no doubt that the legislature of Arizona did on March 13, 1899, pass an act " to abolish the Loan Commission," hereinafter set forth in full. But, in order to determine the effect of such act, it will be necessary to give a synopsis of the prior acts, both territorial and Congressional, upon the same subject.

To meet certain objections that had been raised to the valid-

ity of bonds issued in aid of railroads, (which objections were subsequently sustained by this court in *Lewis* v. *Pima County* 155 U. S. 54,) the legislature of Arizona on March 18, 1887, passed an act consisting of fourteen sections, the first section of which (above cited) constituted the governor, auditor and secretary of the Territory Loan Commissioners of the Territory, for the purpose of providing for the payment of the existing territorial indebtedness of the Territory due, and to become due, and for the purpose of paying and refunding the existing or subsisting *territorial legal* indebtedness, with power to issue negotiable bonds therefor. This power was limited to the *legal* indebtedness of the *Territory* and apparently had no bearing upon the indebtednes of its municipalities—certainly not upon indebtedness which had been illegally contracted.

On June 25, 1890, Congress passed an act, 26 Stat. 175, providing that the above-mentioned funding act of the Territory of Arizona " be, and is hereby, amended so as to read as follows, and that as amended the same is hereby approved and confirmed, *subject to future territorial legislation.*" The first section of this act is an exact copy of the first section of the territorial act of 1887, with an immaterial addition here printed in italics, and reads as follows: " Par. 2039 (Sec. 1). For the purpose of liquidating and providing for the payment of the outstanding and existing indebtedness of the Territory of Arizona *and such future indebtedness as may be or is now authorized by law,* the governor of the said Territory, together with the territorial auditor and territorial secretary, and their successors in office, shall constitute a board of commissioners, to be styled the Loan Commissioners of the Territory of Arizona, and shall have and exercise the powers and perform the duties hereinafter provided." Then follow thirteen other sections, which are also copies of the corresponding sections of the territorial act, with a few immaterial changes as to the rate of interest, the form of the refunding orders, and the maturity of the bonds, etc., and followed by an additional section, (15,) providing against any further increase of indebtedness with certain exceptions, beyond that limited by a former act.

The first question to be considered is as to the relation of

these two acts. Is the act of Congress to be considered as an amendment or a repeal of the territorial act? It is true the preamble speaks of the territorial act as being amended, and, as amended, approved and confirmed. But the language is not that of an amending act, but that of a repeated and substituted act. No attention is called to the amendments, which are not even introduced in brackets, and a careful reading and comparison of the two acts are required to discover where and how the territorial act is amended. It stands as an original piece of legislation, although its different sections contain the numbers taken from the Revised Statutes of Arizona, as well as from the original act of 1887. Both acts are complete in themselves, and each is, upon its face, independent of the other. It is impossible to say that, if the territorial act were repealed, the act of Congress passed three years later would also fail in consequence thereof, because the latter is not only the later, but the paramount act. They must either stand together as two independent pieces of legislation or the general, and perhaps the sounder, rule stated in *United States* v. *Tynen*, 11 Wall. 88, be applied, that where there are two acts on the same subject, and the later act embraces all the provisions of the first, and also new provisions, and imposes different or additional penalties, the latter act operates, without any repealing clause, as a repeal of the first. In that case, the defendant was indicted under an act passed in 1813 for uttering and counterfeiting a certificate of citizenship, purporting to have been issued by a California court. Upon a demurrer being filed to the indictment, the judges differed in opinion, and the case was sent to this court upon a certificate of division. While pending here, in 1870, Congress passed another act, embracing the whole subject of fraud against the naturalization laws, including all the acts mentioned in the law of 1813, and many others. It was held that the act of 1870 operated as a repeal of the act of 1813, and that all criminal proceedings taken under the former act failed; and that even where two acts are not, in express terms, repugnant, yet if the later act covers the whole subject of the first, and embraces new provisions plainly showing that it was intended to be a substitute for the first act, it will operate as a repeal of that act—citing a number of prior cases.

We think that case is controlling of the one under considera-
tion, notwithstanding the cases of *Miners' Bank* v. *Iowa*, 12
How. 107, and *Lyons* v. *Woods*, 153 U. S. 661, relied upon by
the respondents, which are readily distinguishable. In the first
case, the territorial legislature of Wisconsin chartered the
Miners' Bank. Afterwards, an act of Congress annulled the
charter in certain particulars, but left other provisions in force.
Thereafter, the Territory was divided by an act of Congress,
and the Territory of Iowa erected over that former part of the
Territory of Wisconsin in which the bank was located. Later,
the territorial legislature of Iowa repealed the charter, and
directed the settlement of the affairs of the corporation by
trustees under the supervision of the court. It was held that
the annulment of several of the provisions of the bank's charter
did not make the charter of the bank a Congressional charter,
but that it still remained a creation of the legislature of Wis-
consin, and that no Federal question arose from the repeal of
that charter by the legislature of Iowa. The case is totally
different from the one under consideration, and that of *Lyons*
v. *Woods* is equally so. There is a plain distinction between an
act of Congress amending a territorial act by adding or strik-
ing out particular provisions, and one reënacting it substan-
tially in all its provisions.

We, therefore, are constrained to hold, as did the Supreme
Court of the Territory, that the territorial act of 1887 was re-
pealed by the act of Congress of 1890, and that the latter act is
still in force.

Returning now to the subsequent legislation, it appears that
on March 19, 1891, the Territory passed an act "supplemental
to the act of Congress" approved June 25, 1890, and in com-
pliance with the permit given by Congress for future territorial
legislation, the first section of which declared that the act of
Congress "be, and the same is hereby, now reënacted as of
the date of its approval," and enacted that the Loan Commis-
sioners "shall provide" for the funding of the outstanding in-
debtedness "of the Territory, the counties, municipalities and
school districts within said Territory, by the issuance of bonds
of said Territory as authorized by said act;" and also provided

(sec. 7) that "any person holding bonds, warrants, or any other evidence of indebtedness of the Territory, or any county, municipality or school district within the Territory, . . . may exchange the same for the bonds issued under the provisions of this act."

In the following year, and on July 13, 1892, Congress passed another act amending the act of June 25, 1890, in several immaterial particulars, not necessary to be further noticed, and on August 3, 1894, it passed another act amending the act of 1890, also in immaterial particulars.

It seems, however, as stated in *Utter* v. *Franklin*, 172 U. S. 416, 420, that the existing legislation upon the subject was not deemed adequate by the territorial legislature, since in 1895 it adopted a memorial, urging Congress to pass such curative legislation as would protect the holders of all bonds issued under authority of its acts, the validity of which had been acknowledged, and relieve the people from the disastrous effects of repudiation.

In compliance with this memorial, Congress on June 6, 1896, 29 Stat. 262, passed an act extending the provisions of the act of June 25, 1890, and the amendatory act of 1894, the first section of which provided that the above acts "are hereby amended and extended so as to authorize the funding of all outstanding obligations of said Territory, and the counties, municipalities, and school districts thereof, as provided in the act of Congress approved June 25, 1890," etc.; provided that such evidences of indebtedness "have been sold or exchanged in good faith in compliance with the terms of the act of the legislature by which they were authorized," and also providing that they "*shall be funded* with the interest thereon," etc. The second section provided that all bonds and other evidences of indebtedness heretofore funded by the Loan Commission of Arizona under the act of 1890, "are hereby declared to be valid and legal for the purposes for which they were funded, and all bonds and other evidences of indebtedness heretofore issued under the authority of the legislature of said Territory, as hereinbefore authorized to be funded, are hereby confirmed, approved and validated, and may be funded as in this act provided, until January 1, 1897."

This act was held in *Utter* v. *Franklin* to require the refunding of the bonds involved in the case under consideration. There is no suggestion of any attempt having been made to repeal it. This opinion was pronounced January 3, 1899, and on March 13 of the same year the legislature passed a territorial act abolishing the Loan Commission. This act is in the following language :

" An Act to abolish the Loan Commission and to repeal sundry laws relating thereto.

" *Be it enacted by the Legislative Assembly of the Territory of Arizona.* SECT. 1. That par. 2039, Sect. 1, Chapter one, Title 31, of the Revised Statutes of the Territory of Arizona; also that Sect. 1 of Act No. 79, Session Laws of the 16th Legislative Assembly of the Territory of Arizona, also Act No. 33, and Act No. 74, Session Laws of the 18th Legislative Assembly of the Territory, are hereby repealed."

It will be observed that paragraph 2039, thus repealed, is the first section of the territorial act of 1887, whereby the territorial governor, auditor and secretary were constituted Loan Commissioners ; that section 1 of Act No. 79 was the territorial act of March 19, 1891, reënacting the act of Congress of June 25, 1890, which, as before stated, was a substituted copy of the territorial act of 1887. Act No. 33 and Act No. 74 have no bearing upon this case. The former referred only to territorial indebtedness, and the latter merely remedied defects in the records of the Loan Commissioners.

Upon this repealing act being presented to Governor Murphy, one of the defendants, for his approval, he submitted it to the Attorney General for his opinion, and was advised by him that the act was void so far as attempting to abolish the Loan Commission was concerned. He advised the governor that, so far as the bill attempted to repeal section 1 of the territorial act of 1887, it was nugatory, as there was no such section to repeal, Congress having reënacted it and having repealed all acts or parts of acts in conflict with it, and that if it were the intention of the repealing act to repeal the act of 1887 as approved and confirmed by Congress, it was beyond the province

of the territorial legislature to do so.   Upon this opinion the governor returned the act without his approval, but the legislature proceeded to pass it over his veto by a two-thirds vote.

Had the territorial statute of 1887 been the sole authority for the appointment of Loan Commissioners, there would be much force in the argument that the repeal of this statute as well as that of 1891, in 1899, terminated their official existence and operated even on pending cases, *Insurance Co.* v. *Ritchie,* 5 Wall. 541; *Ex parte McCardle,* 7 Wall. 506; *In re Hall,* 167 U. S. 38; but, as we have already indicated, we think the Congressional act of 1890 had already operated as a repeal of that act.   Unless we are to take the position that the repeal of a territorial act operates as a repeal of an act of Congress covering the same subject, it is impossible to deny that the Congressional act of 1890 is still in force.   Had the latter been a mere amendment of the territorial act, the result would have been different, and a repeal of the original operated as a repeal of the Congressional amendment.

It is true that the preamble of the act of 1890 declares that the funding territorial act of 1887 "is hereby amended," and "as amended the same is hereby approved and confirmed, *subject to future territorial legislation,*" and it is insisted that, under this power to amend, it was competent for the territorial legislature to repeal the act altogether, and that such repeal would operate also to repeal the Congressional act of 1890. That, as the legislature, before the approval by Congress of the act of 1887, had the undoubted power to abolish the commission which it had created, and as the act of 1887 was declared by Congress to be "subject to future territorial legislation," it had the power to do after the act of 1890 whatever it might have done before.   But we think this is giving to the words "subject to future territorial legislation" too broad a scope. It was doubtless intended by these words to give to the territorial legislature power to make such new regulations concerning the funding act as future exigencies might seem to require. This power was properly exercised in the territorial act of March 19, 1891.   Congress itself exercised the same power of amendment by its acts of July 13, 1892, August 3, 1894, and

June 6, 1896. While we held in the recent case of *Schuerman* v. *Arizona,* 184 U. S. 342, that the territorial statute of 1887 was the foundation for the appointment of the Loan Commissioners, and that their authority must be exercised in the manner pre-scribed by the territorial laws, it by no means follows that it was within the contemplation of Congress to authorize the legislature to repeal the act of 1890 under which their exist-ence was continued. It was entirely reasonable to assume that the territorial legislature might wish to extend the power of refunding the bonds to those issued by its own municipalities, as well as by itself, as it did by the act of March 19, 1891, but it is inconceivable that, after having passed a complete and in-dependent act of its own for the refunding of territorial bonds, Congress should authorize a territorial legislature to repeal it. While the territorial and Congressional legislation, subsequent to the act of Congress of June 25, 1890, has but little bearing upon the question now in controversy in this case, it indicates plainly that, under the power given for future territorial legis-lation, it was contemplated that such legislation should be in furtherance and extension of the main object of the act of 1890, whereby the power of refunding territorial indebtedness should be extended to the indebtedness of counties, municipalities and school districts of the Territory, and that it could not have been contemplated that power should be given to the terri-torial legislature to abolish the whole system without the con-sent of Congress.

The result is that, even if we are mistaken in saying that the Congressional act of 1890 operated as a repeal of the territorial act of 1887, it is still a separate and independent act which it was beyond the territorial legislature to repeal, and that the office of Loan Commissioners, continued by the act, was not terminated by the repeal of 1899.

But in addition to this, there is a saving clause in the Revised Statutes of Arizona of 1887, which provides as follows:

" 2934, (SEC. 7). The repeal or abrogation of any statute, law or rule does not revive any former statute, law or rule thereto-fore repealed or abrogated, nor does it affect any right then al-ready existing or accrued at the time of such repeal, or any

action or proceeding theretofore taken, except such as may be provided in such subsequent repealing statute, nor shall it affect any private statute not expressly repealed thereby."

It may admit of some doubt whether the petitioners had obtained any such "right" at the time of the repealing act of 1899, as could be said to be then "existing or accrued," and thereby saved by this section, inasmuch as they had obtained no judgment upon the refunding bonds before applying for a writ of mandamus, as was the case in *Memphis* v. *United States*, 97 U. S. 293, although, it is true, they had obtained the opinion of this court that such bonds should issue.

But without expressing an opinion upon this point, we think that the petition for this mandamus was a "proceeding theretofore taken" within the meaning of the saving clause of section 2934, and that the right of the petitioners was saved thereby, even if it be conceded that the Loan Commission had been abolished. In the case of *Memphis* v. *United States*, already alluded to, it was said that "when the alternative writ of mandamus was issued March 22, 1875, a proceeding was commenced under or by virtue of the statute." The defendants insist that the action or proceeding must have resulted in a judgment prior to the repealing statute, in order that the rights should be saved by section 2934. This, however, confounds the distinction between a "right" already "existing or accrued" and an "action or proceeding theretofore taken," since, if the proceeding had culminated in a judgment, the latter clause would be superfluous, and the judgment would be saved by the former clause with respect to a right already existing or accrued. Every word or clause used in a statute is presumed to have a meaning of its own, independent of other clauses, and if a statute preserve not only rights but proceedings it will be presumed that the legislature intended to save both classes, and to give to "proceeding taken" a broader meaning than would be indicated by the words "right existing or accrued."

3. The only remaining questions urged against the issue of a mandamus in this case is that these bonds do not come within the provisions of the act of June 6, 1896, for the reason that the Arizona legislature, finding that an attempt was being made

to include the bonds in question in that act, adopted certain memorials in 1897 and 1899 urging the President to veto the act of Congress legalizing the bonds, and urging upon Congress to pass such legislation as would exclude from the provisions of the act of June 6, 1896, the bonds issued by Pima County to the Arizona Narrow Gauge Railroad Company, so that the act should not be so construed as to validate these bonds. These memorials, however, seem to have been unsuccessful. No interest, however, was paid upon the bonds, and it was shown by the findings of fact that the present owners, Coler & Company, bought them as they matured with notice that the first coupons had been protested, and that the bonds had been repudiated by Pima County from the start. The court below, however, made a finding of fact from which it appeared that the original bonds of Pima County were issued in literal compliance with an act of the Territory of Arizona, approved February 21, 1883, in exchange for bonds of the Narrow Gauge Railroad Company. It is true that the county of Pima derived little or no benefit from the building of the few miles of railroad, but, as was said by the Supreme Court, " there was nothing in evidence showing bad faith on the part of the railroad company, in so far as the first exchange of bonds was concerned, nor is there any evidence which shows bad faith on the part of the company or its contractor, Walker and his principals, Coler & Company, except their failure to continue the building and equipment of the road after the completion of the thirty miles of grading and laying of ten miles of track, except such inferences as may be drawn from the fact that both the railroad company and Coler & Company had difficulty in raising the money for the payment of the work done, and did not have the resources to go on and complete the work. Can the court say that, notwithstanding the fact that the bonds were exchanged in compliance with the terms of the act of February 21, 1883, they are invalid and not within the provisions of the act of Congress of June 6, 1896, because subsequent to their issue the original holders of those bonds failed to complete the railroad, and the county of Pima thereby received no benefit from the same. The question of a failure of consideration is to be dis-

tinguished from that of an exchange of bonds in good faith under the act of June 6, 1896, unless the failure of consideration was due to a failure on the part of the holders of the bonds to comply with the provisions of the act authorizing their issuance. The legislative act was exceedingly liberal in its terms, and contained no safeguard against the failure of the railroad company to build or operate the road. The only provision looking to the protection of the county was the one which required a certificate of the county surveyor, showing that each five miles of the road was graded and laid with ties and iron, as a condition precedent to the exchange of each fifty thousand dollars of county bonds for a like amount of railroad bonds. As the Supreme Court has held in this case, Congress, by the act of June 6, 1896, has validated the territorial act of February 21, 1883. And as the latter did not make the completion of the road a condition precedent to the issuance of the bonds, nor make their validity dependent upon the subsequent conduct of the railroad company, bad faith cannot be predicated of the transaction so long as there was not only a substantial, but a literal, compliance, as well, with the requirements of the act under which they were issued."

But a further answer to these objections to the validity of the bonds is that all the facts upon which these objections are founded existed and were known to the Loan Commissioners at the time the original answer was filed and before the case of *Utter* v. *Franklin* was heard or decided by this court, and should have been then set up as a defence upon the merits.

Upon the whole case we are of opinion that the judgment of the Supreme Court of Arizona, ordering a peremptory mandamus to issue to the present Loan Commissioners, was right, and it is therefore

*Affirmed.*

Mr. Justice Gray did not sit in this case and took no part in its decision.