## UTTER *v.* FRANKLIN.

APPEAL FROM THE SUPREME COURT OF THE TERRITORY OF ARIZONA.

No. 94. Argued and submitted December 12, 1898. — Decided January 3, 1899.

It was within the power of Congress to validate the bonds in question in this proceeding, issued by the authorities of the Territory of Arizona, to promote the construction of a railroad.

THIS was a petition for a writ of mandamus to compel the defendants, who were respectively governor, auditor and secretary of the Territory, acting as loan commissioners, to issue certain bonds in exchange for bonds issued by the county of Pima in aid of the Arizona Narrow Gauge Railroad Company.

The petition set forth that plaintiffs were the *bona fide* holders for value of certain seven per cent bonds and coupons issued in July, 1883, in compliance with an act of the Territory "to promote the construction of a certain railroad," approved February 21, 1883, aggregating, including principal and interest thereon, the sum of $289,964.50. There was a further allegation in the petition that it was the duty of the defendants to provide for the redeeming of such indebtedness and to issue refunding bonds therefor; that plaintiffs had made demands for the same, which defendants had refused.

Defendants demurred to the petition, and for answer thereto averred that the bonds now held by the plaintiffs

had been declared, both by the Supreme Court of the Territory and by this court, to be void, and therefore the petition of the relators should be dismissed.

The petition being denied by the Supreme Court of Arizona, the relators appealed to this court. No opinion was filed in the Supreme Court of the Territory.

*Mr. John F. Dillon* for appellants. *Mr. Harry Hubbard, Mr. John M. Dillon* and *Mr. William H. Barnes* were on his brief.

*Mr. C. W. Wright* for appellees.

MR. JUSTICE BROWN, after stating the case, delivered the opinion of the court.

The bonds now held by the relators were declared to be invalid by this court in *Lewis* v. *Pima County*, 155 U. S. 54, upon the ground that bonds issued in aid of railways could not be considered debts or obligations "necessary to the administration of the internal affairs" of the county, within the meaning of the act of June 8, 1878, c. 168, 20 Stat. 101.

Whether the loan commissioners of the Territory can be required to refund these obligations, and issue new bonds to the holders thereof, depends upon the effect given to certain legislation upon this subject, both by Congressional and territorial statutes. These statutes were enacted both before and after the decision in *Lewis* v. *Pima County, supra.*

It seems that doubts were entertained as to the validity of bonds issued in aid of railroads, in view of the fact above stated, that, under the Congressional act of 1878, the power of municipalities to incur debts or obligations was limited to such as were necessary to the administration of their internal affairs. To put this question at rest, Congress on July 30, 1886, passed an act, c. 818, to limit territorial indebtedness, 24 Stat. 170, in the second section of which it was declared "that no Territory of the United States now or hereafter to be organized, or any political or municipal corporation, or subdivision of any such Territory, shall hereafter make any sub-

scription to the capital stock of any incorporated company, or company or association having corporate powers, or in any manner loan its credit to or use it for the benefit of any such company or association, or borrow any money for the use of any such company or association." This section was undoubtedly designed to put a stop to the practice, which had grown quite common in the Territories, of incurring debts in aid of railway and other corporations.

The fourth section provided for a limit of municipal indebtedness, and then declared " that nothing in this act contained shall be so construed as to affect the validity of any act of any territorial legislature heretofore enacted, or of any obligations existing or contracted thereunder, nor to preclude the issuing of bonds already contracted for in pursuance of express provisions of law, nor to prevent any territorial legislature from legalizing the acts of any county, municipal corporation or subdivision of any Territory as to any bonds heretofore issued or contracted to be issued." This section evidently left the law where it stood before. It did not assume to pass upon the validity of any territorial act previously enacted, or of any obligations thereunder incurred; nor preclude the issue of bonds already contracted for under express provisions of law, leaving the courts to determine the validity of such acts and obligations, and the further question whether such bonds had been contracted for *in pursuance of express provisions of law.* It simply withheld its assent to, as well as its negative upon, such transactions, and declined to commit itself one way or the other. Nor did it assume to prevent the territorial legislature from legalizing the acts of any subordinate municipality as to bonds theretofore issued or contracted to be issued, leaving it to the territorial legislature to determine whether they should attempt to legalize such issues, and to the courts to pass upon the question whether this could be lawfully done. The bonds theretofore issued were left precisely where they stood before, and no attempt was made either to legalize or avoid them. Congress merely stayed its hand, and left the matter open for future consideration.

In this state of affairs the legislature of Arizona, on March

10, 1887, passed an act (Rev. Stat. Arizona, p. 361) constituting the governor, auditor and secretary of the Territory loan commissioners of the Territory, with the duty of providing "for the payment of the existing territorial indebtedness, due and to become due, and for the purpose of paying, redeeming and refunding all or any part of the principal and interest, or either, of the existing or subsisting territorial legal indebtedness," with power to issue negotiable bonds therefor. This power, however, was limited tó the *legal* indebtedness of the *Territory*, and apparently had no bearing upon the indebtedness of its municipalities, certainly not upon indebtedness which had been illegally contracted. Indeed, the act is only pertinent as showing the authority under which the loan commissioners were appointed.

On June 25, 1890, c. 614, Congress passed an act, (26 Stat. 175,) approving with amendments this funding act of Arizona, "subject to future territorial legislation," the second section of which declared it to be the duty of the loan commissioners "to provide for the payment of the existing territorial indebtedness due, and to become due, or that is or may be hereafter authorized by law, and for the purpose of paying, redeeming and refunding . . . the existing and subsisting territorial indebtedness, etc." The tenth section of this act provided that the boards of supervisors of the counties, and the municipal and school authorities, should report to the loan commissioners of the Territory their bonded and outstanding indebtedness, and that said loan commissioners should "provide for the redeeming or refunding of the county, municipal and school district indebtedness, *upon the official demand of said authorities*, in the same manner as other territorial indebtedness, and they shall issue bonds for any indebtedness now allowed, or that may hereafter be allowed by law to said county, municipality or school-district, upon official demand by said authorities."

In compliance with the permit thus given by Congress for future territorial legislation, the legislature of Arizona on March 19, 1891, (Laws of 1891, p. 120,) enacted a new funding act, only the following sections of which are material:

"SECTION 1. That the act of Congress entitled 'An act approving with amendments the funding act of Arizona,' approved June 25, 1890, be, and the same is hereby, now reënacted as of the date of its approval, subject to the modifications and additional provisions hereinafter set out, and to carry out the purpose and intention of said act of Congress the loan commissioners of the Territory of Arizona shall provide for the liquidation, funding and payment of the indebtedness existing and outstanding on the 31st day of December, 1890, of the Territory, the counties, municipalities and school districts within said Territory, by the issuance of bonds of said Territory, as authorized by said act, and all bonds issued under the provisions of this act and the interest thereon shall be payable in gold coin of the United States."

"SEC. 7. Any person holding bonds, warrants or other evidence of indebtedness of the Territory or any county, municipality or school district within the Territory, existing and outstanding on the 31st day of December, 1890, may exchange the same for the bonds issued under the provisions of this act at no less than their face or par value and the accrued interest at the time of exchange; but no indebtedness shall be redeemed at more than its face value and any interest that may be due thereon."

It seems, however, that the existing legislation upon the subject was not deemed adequate by the territorial legislature, since in 1895 it adopted a memorial, (Laws of 1895, p. 148,) to the effect that, under various acts of the assembly, the counties were authorized to and did issue railroad aid bonds, which were sold in the open market at their face value, and were then held at home and abroad by *bona fide* purchasers; that the validity of these bonds, though questioned, was acknowledged by the payment of interest thereon; that a repudiation of the same would work a great hardship to the holders and affect the credit of the Territory, and therefore the general assembly urged upon Congress the propriety of passing such curative legislation as would protect the holders of all bonds issued under authority of its acts, the validity of which had been acknowledged, and relieve the people from

the disastrous effects of repudiation. The memorial is printed in full in the margin,[1] and in construing the act of Congress passed in response thereto it may probably be considered as

---

[1] MEMORIAL.

*To the Senate and House of Representatives of the*
*United States of America in Congress assembled:*

Your memorialists, the legislative assembly of the Territory of Arizona, beg leave to submit to your honorable bodies; that —

*Whereas,* under various acts of the legislative assembly of the Territory of Arizona, certain of the counties of the Territory were authorized to issue in aid of railroads and other *quasi* public improvements and did under such acts issue bonds, which said bonds were sold in open market, in most instances at their face value, and are now held at home and abroad by persons who, in good faith, invested their money in the same, and, save and except such knowledge as the law imputes to the holder of bonds issued under authorized acts, are holders of the same; and

*Whereas* the validity of these bonds for many years after their issuance was unquestioned, and acknowledged by the payment of the interest thereon as it fell due; and

*Whereas* there has recently been raised a question as to whether these acts of the legislative assembly were valid under the organic law of the Territory, which had led to movement looking to the repudiation of the indebtedness created under and by virtue of such acts; and

*Whereas* we believe that such repudiation would, under the circumstances, work great wrong and hardship to the holders of such bonds, and at the same time seriously affect the credit and standing of our people for honesty and fair dealing and bring us into disrepute:

*Therefore* we most strongly urge upon your most honorable bodies the propriety and justice of passing such curative and remedial legislation as will protect the holders of all bonds issued under the authority of acts of the legislative assembly, the validity of which has heretofore been acknowledged, and that you further legislate as to protect all innocent parties having entered into contracts resulting from inducements offered by our territorial legislation, and relieve the people of the Territory from the disastrous effects that must necessarily follow any repudiation of good faith on the part of the Territory, and that you may so further legislate as to validate all acts of the legislative assembly of the Territory which have held out inducements for the investment of capital within the Territory, and which have led to the investment of large sums of money in enterprises directly contributing to the development and growth of the Territory, and thus relieve the honest people of the Territory from the disastrous effects that must necessarily follow any violation of good faith on the part of our people.

*Resolved,* That our delegate to Congress be, and he is hereby, instructed

bearing upon the intention of Congress and the exigencies the act was designed to meet.

In compliance with this memorial Congress on June 6, 1896, 29 Stat. 262, c. 339, passed an act extending the provisions of the act of June 25, 1890, and the amendatory act of 1892, (not here in question,) the first section of which provided that the above acts "are hereby amended and extended so as to authorize the funding of all outstanding obligations of said Territory, and the counties, municipalities and school districts thereof, as provided in the act of Congress approved June 25, 1890, until January 1, 1897, and all outstanding bonds, warrants and other evidences of indebtedness of the Territory of Arizona, and the counties, municipalities and school districts thereof, heretofore authorized by legislative enactments of said Territory bearing a higher rate of interest than is authorized by the aforesaid funding act approved June 25, 1890, and which said bonds, warrants and other evidences of indebtedness have been sold or exchanged in good faith in compliance with the terms of the acts of the legislature by which they were authorized, shall be funded with the interest thereon which has accrued and may accrue until funded into the lower interest-bearing bonds as provided by this act.

"SEC. 2. That all bonds and other evidences of indebtedness heretofore funded by the loan commission of Arizona under the provisions of the act of Congress approved June 25, 1890, and the act amendatory thereof and supplemental thereto approved August 3, 1894, are hereby declared to be valid and legal for the purposes for which they were issued and funded; and all bonds and other evidences of indebtedness heretofore issued under the authority of the legislature of said Territory, as hereinbefore authorized to be funded, are hereby confirmed, approved and validated, and may be funded as in this act provided until January 1, 1897 : *Provided*, That nothing in this act shall be so construed as to

to use all honorable means to bring this subject to the earnest consideration of Congress; that the secretary of the Territory be, and he is hereby, requested to transmit a copy of the foregoing to each house of Congress and to our delegate in Congress.

make the government of the United States liable or responsible for the payment of any of said bonds, warrants or other evidences of indebtedness by this act approved, confirmed and made valid, and authorized to be funded."

This is the act upon which the relators place their chief reliance. Its evident purpose was to authorize the funding of *all outstanding bonds* of the Territory, and its municipalities, which had been *authorized by legislative enactments*, whether lawful or not, provided such bonds had been " sold or exchanged in good faith and in compliance with the terms of the act of the legislature by which they were authorized." The second section deals with the original bonds which had not been theretofore funded, and provides that all such as had been theretofore issued under the authority of the legislature, and which by the first section were authorized to be funded, should be confirmed, approved and validated, and might be funded until January 1, 1897.

We think it was within the power of Congress to validate these bonds. Their only defect was that they had been issued in excess of the powers conferred upon the territorial municipalities by the act of June 8, 1878. There was nothing at that time to have prevented Congress from authorizing such municipalities to issue bonds in aid of railways, and that which Congress could have originally authorized it might subsequently confirm and ratify. This court has repeatedly held that Congress has full legislative power over the Territories, as full as that which a state legislature has over its municipal corporations. *American Ins. Co.* v. *Canter*, 1 Pet. 511; *National Bank* v. *Yankton County*, 101 U. S. 129.

Curative statutes of this kind are by no means unknown in Federal legislation. Thus, in *National Bank* v. *Yankton County*, *supra*, this court sustained an act of Congress nullifying a legislative act of the Territory of Dakota authorizing the issue of railway bonds, but validating action theretofore taken by the county voting subscription to a certain railroad company, holding it to be " equivalent to a direct grant of power by Congress to the county to issue the bonds in dispute." In *Thompson* v. *Perrine*, 103 U. S. 806,

we also sustained a similar act of the State of New York ratifying and confirming the action of commissioners in issuing similar bonds. In *Read* v. *Plattsmouth*, 107 U. S. 568, a similar ruling was made with regard to an act of the legislature of Nebraska validating an issue of bonds by the city of Plattsmouth for the purpose of raising money to construct a high school building. See also *New Orleans* v. *Clark*, 95 U. S. 644; *Grenada County* v. *Brogden*, 112 U. S. 261; *Otoe County* v. *Baldwin*, 111 U. S. 1; 1 Dillon Municipal Corporations, § 544; Cooley's Const. Lim. 6th ed. 456; *Bolles* v. *Brimfield*, 120 U. S. 759; *Anderson* v. *Santa Anna*, 116 U. S. 356; *Dentzel* v. *Woldie*, 30 California, 138, 145.

The fact that this court had held the original Pima County bonds invalid does not affect the question. They were invalid because there was no power to issue them. They were made valid by such power being subsequently given, and it makes no possible difference that they had been declared to be void under the power originally given. The judgment in that case was *res adjudicata* only of the issues then presented, of the facts as they then appeared, and of the legislation then existing.

Nor was the act intended to be confined to the outstanding *legal* indebtedness of the county. The first section of the act *requires* the funding of all outstanding obligations of said Territory and its municipalities, and all outstanding bonds, etc., of the Territory and its municipalities, " heretofore authorized by legislative enactments of said Territory, bearing a higher rate of interest than is authorized by the aforesaid funding act, approved June 5, 1890," which said bonds, etc., " have been sold or exchanged in good faith in compliance with the terms of the acts of the legislature by which they were authorized; " and the second section confirms, approves and validates all bonds and other evidences of indebtedness theretofore issued under the authority of the legislature, and authorized to be funded by the first section, and declares that they " may be funded, as in this act provided, until January 1, 1897." Construing this in the light of the surrounding circumstances, and, particularly, in view of the memorial, it

is entirely clear that it was intended to apply to bonds issued under authority of the legislature, and purporting on their face to be legal obligations of the county, whether in fact legal or not; and to put the matter still further beyond question, they are expressly declared to be legal and valid. It is true that, by the tenth section of the act of Congress of June 25, 1890, the loan commissioners were authorized to refund municipal bonds "upon the official demand of said authorities" of the municipalities, but there is no limitation of that kind in section seven of the territorial funding act of March 19, 1891, which declares that "any person holding bonds, etc., . . . may exchange the same for the bonds issued under the provisions of this act at not less than their face or par value and the accrued interest at the time of the exchange."

In addition to this, however, the act of Congress of June 6, 1896, declared that all the outstanding bonds, warrants and other evidences of indebtedness of the Territory and its municipalities *shall* be funded with the interest thereon, etc.

We are, therefore, of opinion that it was made the duty of the loan commissioners by these acts to fund the bonds in question, and that

*The order of the Supreme Court of the Territory must be reversed, and the case remanded to that court for further proceedings not inconsistent with the opinion of this court.*