H. G. PEVERILL, Appellant, v. BOARD OF SUPERVISORS OF BLACK HAWK COUNTY et al., Appellees; JOHN REUTER, Intervener, Appellant.

No. 39127.

December 14, 1928.

Rehearing Denied April 5, 1929.

*McCoy & Beecher* and *Mears, Lovejoy, Jensen & Gwynne,* for appellants.

*John Fletcher,* Attorney-general, *Earl Wisdom,* Assistant Attorney-general, and *A. G. Reid,* Assistant County Attorney, for appellees.

Albert, J.—This is the second appeal of this case, the opin-

ion in the first appeal being reported in 201 Iowa 1050. After a reversal, and on August 12, 1926, the plaintiff filed an amended and substituted petition, and on March 16, 1927, John Reuter filed a petition of intervention. As the case was disposed of in the lower court on motion to dismiss each of the petitions, it may be necessary to later summarize their contents.

The first division of our former opinion in this case simply holds that plaintiff, H. G. Peverill, was not entitled to complain of the constitutionality of Chapter 48, Laws of the Fortieth General Assembly, because his petition did not allege that he had signed any agreement with the commissioner of animal health (the secretary of agriculture). The second division holds that the pleading does not assault Chapter 23 of the Laws of the Extra Session of the Fortieth General Assembly. Division 3 holds that, because plaintiff does not allege that he is a breeder of cattle, or that he signed an agreement consenting that his herd,—if he is in fact a breeder,—might be tested under the act, and because it does not appear that he is in any way prejudiced by the change in the law, he is not, therefore, in a position to question the validity of the enactment upon the ground alleged. Next, that the invalidity of a particular provision of one section of the chapter will not invalidate the full chapter. Division 4 deals with Section 25 of Chapter 23 of the Laws of the Extra Session of the Fortieth General Assembly and Chapter 94, Supplement to the Laws of the Extra Session, which in express terms legalizes the act of the secretary of agriculture of which complaint is now made. The holding is that there were no proper pleadings calling into question the constitutionality of Chapter 23 of the Laws of the Extra Session of the Fortieth General Assembly, and therefore the question was eliminated from the discussion. The opinion closes with the statement that ''the petition does not state a cause of action, nor is appellee entitled to the relief prayed. The demurrer should have been sustained;'' and the case was remanded. On its reappearance in the district court, plaintiff filed an amended and substituted petition, in which he substantially added the elements necessary to the making of a good petition which the former opinion in this case held were wanting.

The intervener, John Reuter, thereupon filed a petition of intervention, in which he made substantially the allegations con-

tained in plaintiff's amended and substituted petition, and the further allegation that said intervener had signed the petition or agreement required by the statute. Both of these petitions contained the necessary allegations, and raised the constitutional questions hereinafter referred to. Each was attacked by a separate motion to dismiss. These motions were substantially the same, and sufficiently raise all questions hereinafter discussed.

The first division of the appellant's argument is devoted to the question of whether or not injunction is the correct remedy in this proceeding. This question is raised in the motion to dismiss, wherein it is said that the proper remedy is certiorari, and not injunction; but in argument the defendants waive this question, and say they do not care to urge the same. We will, therefore, give it no further attention.

Division 2 is devoted to a discussion of the question that the secretary of agriculture was guilty of fraud, acted fraudulently, failed to discharge his duty, and was guilty of a breach of trust. By reason of a question to be discussed later, we will give no attention to this proposition at the present time.

The third division is devoted to a discussion of the constitutionality of the legislative acts which it is claimed impair the obligation of the contracts. The agreements were signed under  the original law, which provided for compensation in case of the slaughtering of animals found to react to the tuberculin test. Later, by amendment, it was provided that five per cent of the value of the whole herd should be deducted before the owner should receive any compensation (see Section 10-k, Chapter 48, Acts of the Fortieth General Assembly) ; hence it is claimed that this impairs the obligation of contracts. Whatever merit there is in this contention is eliminated by reason of Section 1, Chapter 54, Acts of the Forty-second General Assembly, which repealed the provision as to the deduction of 5 per cent of the value of the whole herd. This latter law went into effect before the decision of this matter in the lower court; hence the question becomes entirely moot.

Division 4 is devoted to a discussion of the constitutionality of the law as it existed at the time it was sought to establish Black Hawk County under the accredited-area plan. If found necessary, this matter will be given further attention later.

The next proposition is that the curative act did not render valid the act of the board of supervisors and secretary of agriculture,—make constitutional that which was previously unconstitutional. Under this proposition, it is argued that neither the board of supervisors nor the secretary of agriculture had jurisdiction to perform the acts they did in respectively declaring Black Hawk County to be a "county area" and an "accredited area." Narrowed down, the claim is that, where an inferior officer or body acts without jurisdiction in the first instance, such action cannot be given life and vitality by a legalizing act later passed by the legislature.

In *Coggeshall v. City of Des Moines,* 78 Iowa 235, a pavement assessment was held void because of want of jurisdiction, as the city had no power to make the same because of its failure to follow certain statutory requirements. Subsequent thereto, the legislature, by the enactment of Chapter 44 of the Acts of the Twenty-second General Assembly, sought to legalize these assessments.

In the case of *Tuttle v. Polk & Hubbell,* 84 Iowa 12, the question was raised as to the legality of this legalizing act. In the latter case it is said:

"It is conceded that it is within the power of the legislature to legalize any defect in proceedings of this kind if the defect or omission or want of compliance with the law is such that it might have been dispensed with by a prior statute. We understand this to be the rule in all courts in this country. *Boardman v. Beckwith,* 18 Iowa 292; *State v. Squires,* 26 Iowa 340; *Richman v. Board of Supervisors,* 77 Iowa [513], 517 * * *. Some of the cited cases hold that the defective proceedings may be made valid by subsequent legislation, where, by reason of the defect or omission, the proceeding was absolutely void. It was, therefore, competent for the legislature to have passed an act legalizing the proceedings by declaring that the contracts for the paving should be valid, notwithstanding the omission to comply with the statute in the matter of determining the kind of material before advertising for bids. It was competent for the legislature to have provided that the work might be let to bidders without first determining the material to be used, and to take bids for any kind of

material, and let the contracts for that kind which it was thought would best subserve the public interests. And the authorities cited hold that this curative legislation may be enacted while suits are pending in the courts involving the validity of the defective proceedings.''

In the case of *Richman v. Board of Supervisors of Muscatine County,* 70 Iowa 627, a ditch levy was held to be void for want of jurisdiction. The twenty-first general assembly passed a curative act, legalizing the proceedings, and in *Richman v. Supervisors Muscatine County,* 77 Iowa 513, we held that the legalizing act was constitutional. See, also, *Iowa Railroad Land Co. v. Soper,* 39 Iowa 112. In the latter case, another point raised by the appellant was disposed of adversely to his contention, where it was held that such legislation is not obnoxious to Section 30, Article 3, of the Constitution, providing against local or special laws.

In the case of *Utter v. Franklin,* 172 U. S. 416 (43 L. Ed. 498), the United States Supreme Court had before it this identical question. The territory of Arizona had issued certain bonds which were void, because not authorized by an act of Congress. The Supreme Court of the United States ·so held. Later, Congress passed a legalizing or curative act, validating said bonds. In the *Utter* case, that court said:

''The fact that this court had held the original Pima County bonds invalid does not affect the question. They were invalid because there was no power to issue them. They were made valid by such power, being subsequently given, and it makes no possible difference that they had been declared to be void under the power originally given. The judgment in that case was *res adjudicata* only of the issues then presented, of the facts as they then appeared, and of the legislation then existing.''

The case holds that Congress had the power to thus validate said bonds.

We said in the former opinion in this case (*Peverill v. Board of Supervisors*), 201 Iowa 1050:

''It is, of course, conceded by all parties that the legislature

may legalize any act which might have been omitted from the law or which it had constitutional power to enact."

We further said in that case:

"Whether or not, if the legislature had omitted the provision requiring petitions or agreements to be filed, such omission would have rendered the act invalid, it is certain that the legislature could have fixed the percentage at less than 75 per cent, e. g., 52 per cent. If the legislature has such power, then why can it not legalize the act of the secretary, if it were doubtful as to whether the required number of agreements was on file, or if it was difficult or impossible to determine the question accurately? The designation of the percentage as 75 per cent of the owners of breeding cattle in any county was purely arbitrary, and could as well have been made greater or less. We perceive no reason, therefore, why Chapter 94 was not effective as a curative act operative upon all matters argued, including the plea of fraud."

The legalizing act was, in our opinion, valid.

Narrowed down, the situation in the case (if we take the appellant's contention under the allegations of his petition) is that, according to the last assessment rolls in Black Hawk County, the number of owners of breeding cattle was 2,356. The number of agreements and petitions filed with the secretary of agriculture was 1,858, which, of course, exceeds the 75 per cent limit. But appellant's claim is that, if the duplications and nonresidents, the signers who were not owners of breeding cattle, the forgeries, and 225 withdrawals were stricken therefrom, there were left only 1,235 so-called "live and valid" petitions or agreements; hence that the secretary of agriculture had no jurisdiction.

It is apparent, therefore, on the face of the filings with the secretary of agriculture, that more agreements were filed than were required by the statute. One of the questions for determination by the secretary of agriculture, before he made the order establishing Black Hawk County as an accredited area, was whether or not the statute with reference to the number of agreements required had been complied with. This probably, as contended by appellant, was a judicial act. But with this situation, how can it be said that the secretary of agriculture did not have

jurisdiction in the matter? His action was not reviewed, by certiorari or otherwise, and it is now sought to be collaterally attacked in this proceeding. It seems to us, therefore, that there are two answers to appellant's contention in this matter: (1) That, under the prima-facie record made, the secretary of agriculture did have jurisdiction; and (2) that, if he did not have jurisdiction, under the line of authorities already cited from this state and other states, it was such a situation as that it could be and was remedied by the curative act passed, which was constitutional.

As suggested in the first opinion, the legislature could have required a petition signed by any number of breeders of cattle it chose. It might have said that a petition signed by one cattle breeder would be sufficient; or it might have fixed 25 per cent of the owners of breeding cattle in the county as the required number. In other words, it was wholly within the power of the legislature to require such number as it deemed wise, to file petitions with the secretary of agriculture. No one disputes this power on the part of the legislature. If it had the power, therefore, to so fix the number of petitioners required in the first instance, under the well settled line of authority in this state, and, in fact, in all of the states, it had the power to legalize the defects herein claimed by the appellant. We see no escape from this conclusion. In other words, if we had the facts in this case as alleged by the plaintiff, and the statute had required petitions or agreements from 50 per cent of the owners of breeding cattle in the county, the appellant would have no reason to complain, because, under the admitted facts, more than 50 per cent of the owners of breeding cattle in the county did file such petitions and agreements. We therefore hold against appellant's contention in this respect, and conclude that the legalizing act which is here attacked was a valid exercise of legislative power.

A review of the legislation on the subject of bovine tuberculosis will aid in the understanding of the questions involved in this case. The first statute touching this subject is Chapter 287, Laws of the Thirty-eighth General Assembly. Section 10 thereof provides for applications to be made by the owners of herds who desire the same to be examined and tested, to be accompanied by an agreement that the signer will con-

form to and abide by the rules and regulations laid down by said commission, and follow instructions of the commission, etc. The act further provides for the slaughtering or quarantine of infected animals; also, for accrediting herds approved by the commission. It will be noted that this statute is purely permissive, providing means by which owners of breeding cattle may have the same examined and tested, with a view of detecting the presence of tuberculosis, at the expense of the state.

Chapter 48, Acts of the Fortieth General Assembly, provides first for a county-area testing unit, the substance of which is that, whenever 51 per cent of the owners of breeding cattle within a county present to the board of supervisors petitions, with the agreements provided for in Section 10 of the original act, the board shall be given the right to make application to the commission of animal health of the state for the enrollment of said county under the county-area plan; and the commission is directed, on the filing of the required number of agreements, to designate such county as a county-area testing unit; and the commission of animal health then appoints an inspector, whose duty it is to test the breeding cattle of such owners as shall have signed agreements provided for in Section 10 of the original act. It will be noticed here that, under this law, neither the board of supervisors nor the commission of animal health is required to give notice or hearing on any matters involved. This also provides for what is designated as an ''accredited area,'' and provides that, whenever 75 per cent of the owners of breeding cattle in any county operating under the county-area plan shall have signed agreements with the commission of animal health, said commission shall notify the board of supervisors of such county of such fact, and such board of supervisors shall, at the next regular meeting, by resolution, declare such county's intention to become an accredited area, and it shall thereafter become the duty of every owner of breeding cattle within said county to cause his breeding cattle to be tested, under the accredited-area plan.

A divergence is to be here noted between this plan and the original plan, as marked out, the point being that, after the county has been declared to be an accredited area, the statute requires every owner of breeding cattle in the county to have the same tested; whereas, under the prior law, only those who filed

petitions and signed agreements were required to have their cattle tested. In other words, where a county is already operating under the county-area plan, this statute permits 75 per cent of the owners of breeding cattle, by filing the applications and agreements with the proper authorities, after the proper action by such authorities, to compel all owners of breeding cattle within the county to submit their cattle to the test. It is also to be noted that, in the establishment of this county accredited-area plan, there is no provision whatever for notice and hearing; and it follows, as a matter of course, that none of the parties who have signed petitions and agreements can complain of want of notice and opportunity to be heard. But what about the parties who are owners of breeding cattle within the county who have not signed such petitions and agreements? This question is of importance, in view of the fact that this statute carries a penalty for any owner of breeding cattle who fails to have his cattle tested after the county-area-eradication plan has been so adopted.

It may also be noted that, up to this point, no requirement is made that either the board of supervisors or the commissioner of animal health is required to pass upon the sufficiency of the petitions or agreements, or make any finding whatever in relation thereto.

The extra session of the fortieth general assembly passed House File No. 68, part of which appears in the Code of 1924 as Sections 2683 and 2684. Section 2683 provides that, when such petitions and agreements are filed with the board of supervisors of the county, notice shall be published of the date of hearing on said petitions; and Section 2684 gives opportunity for objections to be filed, and requires the board of supervisors to pass upon the sufficiency of the petition, and provides, if it is found to be sufficient, then, upon proper application by them, the secretary of agriculture (who by law succeeded the commission of animal industry), upon receiving such application, shall enroll the county under such county-eradication plan.

Section 2694 provides for the accredited-area plan to be declared by the secretary of agriculture, upon the filing of signed agreements of 75 per cent of the owners of breeding cattle of any county operating under the county-area plan. It then provides that the secretary of agriculture shall so notify the board of supervisors. Section 2695 requires the board to publish notice

for two weeks thereof, and provides that thereafter every owner of breeding cattle shall cause his herd to be tested for tuberculosis, etc.

At this point, it is still to be noted that the secretary of agriculture exercises his powers without notice of hearing, and without any requirements that he pass upon the sufficiency of the agreements filed with him.

By Section 2700, Code of 1924, any owner of breeding cattle who does not apply for and sign an agreement for such test, or fails to have his cattle tested as provided therein within a period of 90 days from the publication of notice of enrollment, shall be guilty of a misdemeanor, and shall be punished by a fine of not more than $100.

Chapter 23 of the Acts of the Extra Session of the Fortieth General Assembly is a recodification of the law relative to the county-area-eradication plan and the accredited-area plan. The first plan is practically identical with the law as it existed prior to the passage of this act, providing for the filing of a petition of 51 per cent of the owners of breeding cattle in the county and their agreements for a notice and hearing before the board of supervisors, and for an application by the board to the secretary of agriculture for the enrollment of the county under such plan.

This law was also re-enacted, giving to the secretary of agriculture the right to enroll the county under the accredited-area plan, upon the filing of a petition signed by 75 per cent of the owners of breeding cattle in any county operating under the county-area plan, and providing that, after so doing, he shall notify the board of supervisors, who shall publish notice thereof.

At this point, it is still to be noted that, so far as the department of agriculture is concerned, its action is without notice and opportunity to be heard, and without any requirement that it pass upon the sufficiency of the agreements signed. The penalty here provided is that, where the county has been enrolled under the accredited-area plan, every owner of breeding cattle may be penalized for failing to have his cattle tested within 90 days from the publication of the notice by the board of supervisors of the enrollment of said county as an accredited area.

As applied to the instant case, at this point Chapter 94 of the Acts of the adjourned Extra Session of the Fortieth General Assembly was passed, which purports to legalize the acts of the

secretary of agriculture heretofore made and done in enrolling any county in the state under the accredited-area plan for the eradication of bovine tuberculosis, under the provisions of Chapter 23 of the Acts of the Extra Session of the Fortieth General Assembly, making the same valid and legal in the same manner as all provisions of the law preliminary and relating thereto that had been fully complied with; and said counties are declared to be so enrolled. This act was approved on July 28, 1924, and was published on July 30, 1924, under a publication clause in the act. The preamble of this act (Chapter 94) reads as follows:

"Whereas, as the law now reads, it is quite difficult for the secretary of agriculture to determine accurately the number of owners of breeding cattle in any county, who have signed agreements in force, under the provisions of law relating to the accredited-area plan for the eradication of bovine tuberculosis, and

"Whereas, ostensibly there has been filed in good faith with the secretary of agriculture the required number of such agreements in certain counties, to authorize the secretary of agriculture to enroll said counties under the said accredited-area plan, and

"Whereas, certain counties have been in good faith enrolled by the secretary of agriculture of Iowa under the accredited-area plan for the eradication of bovine tuberculosis, therefore,

"Be it enacted by the General Assembly of the State of Iowa:"

It is apparent, therefore, that this act is intended to legalize and validate in the same manner as if all of the provisions of law preliminary and relating thereto had been fully complied with. The question is, Can the legislature, by this legalizing act, supply the want of notice and opportunity to be heard before the secretary of agriculture, in so far at least, as those owners of breeding cattle in the county are concerned who did not sign such agreement?

Later, the legislature provided for notice and hearing, by Chapter 54 of the Acts of the Forty-first General Assembly, which went into operation by publication on April 17, 1925, providing that the secretary of agriculture shall publish notice of the hearing on said agreements, giving the right to file objections before the secretary of agriculture, and that he is to determine

whether or not the county shall become an accredited area. If the secretary of agriculture finds the petitions sufficient, he shall so enter of record, establishing the county as an accredited area, and notify the board of supervisors of the county accordingly.

By Chapter 54 of the Acts of the Forty-second General Assembly, which went into operation on April 15, 1927, the number of signers required before the secretary of agriculture was reduced from 75 per cent to 65 per cent, but the provision was still retained for notice and hearing.

It is apparent, therefore, from the various mutations of this law, that Black Hawk County was duly and legally established under the county-area plan, and that none of the objections raised by the appellant are tenable as to its establishment as such under the county-area plan. The question is as to the validity of the designation of this county by the secretary of agriculture as an accredited area, and the real point is whether or not the secretary of agriculture had the power to establish this county as an accredited area, thus forcing the owners of breeding cattle within the county who have not signed an agreement with the secretary of agriculture to subject their herds to the tuberculosis test, as provided by law, without notice and opportunity to be heard. This gives rise to the question of the kind or character of the Bovine Tuberculosis Law. If the legislature, in enacting this law, was exercising its rights under the police power, then it could, if it so elected, authorize the testing of these cattle and the destruction of those found infected, without notice and hearing, and, without even providing compensation therefor. That laws of this character have been held by this court and other courts to come within the purview of the police power is now settled. *Waud v. Crawford*, 160 Iowa 432.

We discussed this question elaborately in the case of *Fevold v. Board of Supervisors*, 202 Iowa 1019, and that discussion need not be repeated here. The state of Minnesota, under a similar law, made a similar pronouncement in *Schulte v. Fitch*, 162 Minn. 184 (202 N. W. 719). The latter case, after citing authorities, concludes as follows:

"As the statute is clearly a measure for the protection of the public against disease, it is not within the constitutional inhibition against taxation for private purposes, nor within the inhibi-

tion against the state, engaging in work of internal improvement. That dairy products certified as coming from a 'modified accredited area,' as defined in the Federal regulations, bring higher prices in the markets than such products from other areas, a fact shown by the record, does not establish that the act is for a private purpose, as claimed by plaintiffs, but that the public recognizes that such areas are comparatively free from infection, and that food products therefrom may be consumed with little or no danger of contracting the disease.''

At this point we refer to the reply argument of the appellant herein, where he says:

''We desire to call your honor's attention to the fact that it is one of our contentions that the constitutional questions we are discussing have nothing to do with, or are not concerned with, health legislation. The constitutional questions discussed are not ones involving police power, or the authority of the legislature to enact health legislation. The question involved is not whether the law is unconstitutional in its provisions as to what can be done after a county has been legally and constitutionally established under the area and accredited-area plans, but the question is, Is the law unconstitutional in its preliminary steps which, under the law, are required, in order to establish a county under the county-area-eradication plan and the accredited-area plan? It is our contention that the preliminary steps provided for in the Bovine Tuberculosis Law are unconstitutional, for the reason that they do not provide due process of law. It is our position that due process of law requires a hearing and the notice of a hearing. This is true even though the proceedings are clearly within and are authorized by the police power.''

This presents the question of where the legislature enacts a statute under the police power, and whether, in so doing, it is bound by the rule of due process to the extent of requiring the provisions for notice and opportunity to be heard.

The contention of the appellant is that the statute is unconstitutional in that it violates due process of law, independent of the question of whether the statute was enacted under the exercise of the police power. With this we cannot quite agree. The

question rather is, stated in a simple form, Is the due-process rule a limitation on the right to exercise the police power?

The due-process rule is not confined alone to our system of jurisprudence, but is common to thoughtful men everywhere. The heart of it lies in the thought that a right to present defenses must precede judgment; and, necessarily involved therein, the right of notice and opportunity to be heard is the very foundation of the doctrine. As heretofore noted, the law as it existed at the time of the action of the secretary of agriculture in declaring Black Hawk County to be an accredited area, made no provision whatever for notice and opportunity to be heard, as to those parties who had not signed agreements with the secretary of agriculture, as provided by the statute. This, of course, *prima facie* was not due process of law as to them. The question is, Does this failure to observe due process of law in this respect make this statute unconstitutional, where the statute, as it is in this case, was enacted under the exercise of the police power?

Many general statements are found in the books to the effect that the due-process rule does not limit the right to exercise the police power. When we analyze the proposition, this general statement seems too broad. We had before us, in the case of *Smith v. State Board of Medical Examiners*, 140 Iowa 66, a question of the right of the board of medical examiners to revoke the certificate previously issued by them to Smith as a physician. The claim was that the statute authorizing the revocation was void because the action of the board in so doing was without due process of law. We there said, *arguendo*, that statutes regulating the practice of medicine fell clearly within the police power of the state, and said:

"* * * they cannot be permitted to override the Constitution, but they must be reasonable; and when a valuable right is sought to be disturbed thereunder, the provision of the Constitution prohibiting the taking of property without due process of law is paramount, and must be observed."

This pronouncement is not, however, in harmony with *State v. Schlenker*, 112 Iowa 642, involving the question of the constitutionality of a statute penalizing the sale of adulterated milk. This question was raised, and we there held that the statute was constitutional, as a police regulation. We there said:

"Appellee further contends that the statute in question is in violation of the Fourteenth Amendment to the Federal Constitution. Such contention is not sound, for it is fundamental that this amendment does not impose any restraints on the exercise of the police power of the state for the protection of the safety, health, or morals of the community,"—citing several United States Supreme Court cases.

The first time this question of due process of law was held to be a limitation of the police power was suggested in the case of *Wynehamer v. People*, 13 N. Y. 378, in which case the statute provided for the destruction of liquor by summary process as soon as the law went into effect. The law was held invalid, as violating due process. This case had a somewhat stormy career, even though it was epoch-making in its effect. It is discussed and followed and denied by various courts; and, while not made a basis of the decision, it was referred to in the famous *Dred Scott Decision*, by Justice Taney. Fifteen years later, in the Supreme Court of the United States, the argument was again used in the *Legal Tender Cases*, 12 Wall. (U. S.) 457, 551, Justice Strong declaring that:

"* * * due process * * * has always been understood as referring only to a direct appropriation, and not to consequential injuries resulting from the exercise of lawful power. It has never been supposed to have any bearing upon, or to inhibit, laws that indirectly work harm and loss to individuals."

This was rather a setback to the doctrine that due process was a limitation on the police power. Later, Justice Strong, in a dissenting opinion in the *Sinking-Fund Cases*, 99 U. S. 700 (25 L. Ed. 496), acceded to the doctrine that it was in some respects a limitation on the police power. It was referred to again in the *Slaughter-House Cases*, 16 Wall. (U. S.) 36 (21 L. Ed. 394), and again in the Granger cases, *Munn v. Illinois*, 94 U. S. 113 (24 L. Ed. 77); but the question is left shrouded in mystery in that case, although Justice Field, in his dissenting opinion, intimates quite clearly that the police power was limited by the due-process amendment. Later, Justice Field flatly declared that the Fourteenth Amendment was not designed to interfere with

the power of a state sometimes termed "its police power." See, also, *Barbier v. Connolly,* 113 U. S. 27.

In the case of *Missouri Pac. R. Co. v. Humes,* 115 U. S. 512 (29 L. Ed. 463), Justice Field expressed surprise at the increasing number of cases in which due process was being urged.

In 1887, the case of *Mugler v. Kansas,* 123 U. S. 623 (31 L. Ed. 205), was decided by the United States Supreme Court. This case involved the Kansas prohibitory law. The court there admits the early dictum of Justice Field that due process was no limitation on the police power, but qualifies it with the statement that:

"There are, of necessity, limits beyond which legislation cannot rightfully go. * * * If, therefore, a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution. * * * Undoubtedly, the state, when providing, by legislation, for the protection of the public health, the public morals, or the public safety, is subject to the paramount authority of the Constitution of the United States, and may not violate rights secured or guaranteed by that instrument * * *."

Although this doctrine has been frequently recognized by the Supreme Court of the United States, it refused to apply the same in many cases until 1894. In the case of *Reagan v. Farmers' L. & Tr. Co.,* 154 U. S. 362 (38 L. Ed. 1014), a police regulation was declared unconstitutional because it was inconsistent with due process of law as a substantive requirement, in that the particular statute was not a police regulation in fact. The doctrine is again announced in *Gulf, C. & S. F. R. Co. v. Ellis,* 165 U. S. 150 (41 L. Ed. 666), and in the case of *Smyth v. Ames,* 169 U. S. 466 (42 L. Ed. 819), where a statute enacted under the police regulation was held void because it violated due process. These latter cases, however, were all railroad rate cases, and the doctrine was not applied generally by the United States Supreme Court in other fields. Later, in the case of *Lochner v. New York,* 198 U. S. 45 (49 L. Ed. 937), that court declared a statute regulating labor conditions void because it violated due process of

law and was not a proper exercise of the police power. The doctrine laid down by the *Lochner* case has been repeatedly recognized by that court. *McLean v. State of Arkansas,* 211 U. S. 539 (53 L. Ed. 315) ; *Coppage v. State of Kansas,* 236 U. S. 1 (59 L. Ed. 441) ; *Reinman v. City of Little Rock,* 237 U. S. 171 (59 L. Ed. 900) ; *Buchanan v. Warley,* 245 U. S. 60 (62 L. Ed. 149) ; *Adams v. Tanner,* 244 U. S. 590 (61 L. Ed. 1336).

In the *Lochner* case, supra, the state of New York passed a law providing, among other things, that employees in bakeries should not work more than 60 hours in one week, and the court, in discussing the constitutionality of this law, said:

''Therefore, when the state, by its legislature, in the assumed exercise of its police powers, has passed an act which seriously limits the right to labor or the right of contract in regard to their means of livelihood between persons who are *sui juris* (both employer and employee), it becomes of great importance to determine which shall prevail,—the right of the individual to labor for such time as he may choose, or the right of the state to prevent the individual from laboring, or from entering into any contract to labor, beyond a certain time prescribed by state. * * * It must, of course, be conceded that there is a limit to the valid exercise of the police power by the state. There is no dispute concerning this general proposition. Otherwise the Fourteenth Amendment would have no efficacy, and the legislatures of the states would have unbounded power, and it would be enough to say that any piece of legislation was enacted to conserve the morals, the health, or the safety of the people; such legislation would be valid, no matter how absolutely without foundation the claim might be. The claim of the police power would be a mere pretext,—become another and delusive name for the supreme sovereignty of the state, to be exercised free from constitutional restraint. This is not contended for. In every case that comes before this court, therefore, where legislation of this character is concerned, and where the protection of the Federal Constitution is sought, the question necessarily arises: Is this a fair, reasonable, and appropriate exercise of the police power of the state, or is it an unreasonable, unnecessary, and arbitrary interference with the right of the individual to his personal liberty, or to enter into those contracts in relation to labor which may seem to him

appropriate or necessary for the support of himself and his family? Of course, the liberty of contract relating to labor includes both parties to it. The one has as much right to purchase as the other to sell labor. This is not a question of substituting the judgment of the court for that of the legislature. If the act be within the power of the state, it is valid, although the judgment of the court might be totally opposed to the enactment of such a law. But the question would still remain: Is it within the police power of the state? and that question must be answered by the court."

In the dissenting opinion of Justice Harlan in the *Lochner* case, he quotes the following from *Barbier v. Connolly,* supra:

" 'But neither the [14th] amendment,—broad and comprehensive as it is,—nor any other amendment, was designed to interfere with the power of the state, sometimes termed its police power, to prescribe regulations to promote the health, peace, morals, education, and good order of the people.' "

It is upon this quotation that Judge Vermilion bases his ruling in the case of *Fevold v. Board of Supervisors,* supra.

In *McLean v. State of Arkansas,* supra, the question under consideration was the constitutionality of a statute penalizing miners or operators where the employees were paid quantity rates, from contracting for wages based upon the basis of screened coal. The court there said:

"It is, then, the established doctrine of this court that the liberty of contract is not universal, and is subject to restrictions passed by the legislative branch of the government in the exercise of its power to protect the safety, health, and welfare of the people. It is also true that the police power of the state is not unlimited, and is subject to judicial review, and when exerted in an arbitrary or oppressive manner, such laws may be annulled, as violative of rights protected by the Constitution. While the courts can set aside legislative enactments upon this ground, the principles upon which such interference is warranted are as well settled as is the right of judicial interference itself."

In *Reinman v. City of Little Rock,* supra, the defendant passed an ordinance reciting that "the conducting of a livery-

stable business within certain parts of the city of Little Rock, Arkansas, is detrimental to the health, interest, and prosperity of the city;'' and the conducting of such business was held unlawful. The attack made on the ordinance was that it violated rights guaranteed by the Fourteenth Amendment. The court held that the ordinance was well within the range of power of the state to legislate for the health and general welfare of the people, and continued:

''* * * so long as the regulation in question is not shown to be clearly unreasonable and arbitrary, and operates uniformly upon all persons similarly situated in the particular district, the district itself not appearing to have been arbitrarily selected, it cannot be judicially declared that there is a deprivation of property without due process of law, or a denial of the equal protection of the laws, within the meaning of the Fourteenth Amendment.''

In *Adams v. Tanner*, supra, the state of Washington, by initiative and referendum, passed a law which prohibited employment agencies from charging persons any fee or remuneration, where such person secured employment at the hands of the employment agency. The court there said:

'' 'The Fourteenth Amendment protects the citizen in his right to engage in any lawful business, but it does not prevent legislation intended to regulate useful occupations which, because of their nature or location, may prove injurious or offensive to the public. Neither does it prevent a municipality from prohibiting any business which is inherently vicious and harmful. But, between the useful business which may be regulated and the vicious business which can be prohibited lie many non-useful occupations, which may or may not be harmful to the public, according to local conditions, or the manner in which they are conducted.' ''

In *Buchanan v. Warley*, 245 U. S. 60 (62 L. Ed. 149), the defendant refused to specifically perform a contract for the sale of certain lots in the city of Louisville, on the ground that the purchaser, a colored man, expected to build a residence thereon, to be occupied by him, and that the city ordinances of the city of Louisville provided that it was unlawful for any colored person

to "move into and occupy as a residence, * * * any house upon any block upon which a greater number of houses are occupied as residences * * * by white people than are occupied as residences * * * by colored people." The question was as to the constitutionality of this ordinance. The court there said:

"We think this attempt to prevent the alienation of the property in question to a person of color was not a legitimate exercise of the police power of the state, and is in direct violation of the fundamental law enacted in the Fourteenth Amendment of the Constitution, preventing state interference with property rights except by due process of law. That being the case, the ordinance cannot stand."

In *Radice v. State of New York*, 264 U. S. 292 (68 L. Ed. 690), the city of Buffalo passed an ordinance prohibiting women from working in restaurants between the hours of 10 at night and 6 in the morning. The court held that this was a proper exercise of police power, and was a proper police regulation, and that, therefore, the due-process rule did not invalidate the ordinance.

In *Terrace v. Thompson*, 263 U. S. 197 (68 L. Ed. 255), the state of Washington passed a statute prohibiting aliens from owning or leasing land within the state. The opinion holds that in so doing the state was properly exercising its police power; hence there was no infringement of the due process of law.

In *Ohio Util. Co. v. Public Util. Com. of Ohio*, 267 U. S. 359 (69 L. Ed. 656), it is held that limiting a public utility to a return of less than 5 per cent upon the value of its property unconstitutionally deprives it of its property without due process of law.

In *Missouri, K. & T. R. Co. v. Oklahoma*, 271 U. S. 303 (70 L. Ed. 957), the state corporation commission ordered the railroad company to construct a subway under certain of its tracks; and this action was attacked as unconstitutional, as violating the due-process rule. It was there held that this was within the police power of the state, and the court said:

"The legitimate exertion of police power to that end does not violate the constitutional rights of railroad companies."

In *Weaver v. Palmer Bros. Co.*, 270 U. S. 402 (70 L. Ed. 654), it was held that a statute prohibiting the use of shoddy,

new or old, even when sterilized, in the manufacture of comfortables for beds, is unreasonable and arbitrary, and deprives the manufacturer of due process of law.

In *Fiske v. Kansas,* 274 U. S. 380 (71 L. Ed. 1108), it was said, as to the Criminal Syndicalism Act of that state:

"The result is that the Syndicalism Act has been applied in this case to sustain the conviction of the defendant, without any charge or evidence that the organization in which he secured members advocated any crime, violence, or other unlawful acts or methods as a means of effecting industrial or political changes or revolution. Thus applied, the act is an arbitrary and unreasonable exercise of the police power of the state, unwarrantably infringing the liberty of the defendant, in violation of the due-process clause of the Fourteenth Amendment."

In the case of *Miller v. Schoene,* 276 U. S. 272 (72 L. Ed. 568), it was held that an act of the state of Virginia authorizing the state entomologist to destroy all cedar trees within a radius of two miles from an apple orchard was a proper and reasonable exercise of the police power, and hence was not subject to challenge under the due-process law clause of the Fourteenth Amendment.

In *Sprout v. City of South Bend,* 277 U. S. 163 (72 L. Ed. 833), the city of South Bend by ordinance prohibited (with exceptions not material here) the operation on its streets of any motor bus for hire unless licensed by the city. This license could only be procured when the applicant had taken out liability insurance, as therein provided. The court there said:

"But it does not appear that the license fee here in question was imposed as an incident of such a scheme of municipal regulation; nor that the proceeds were applied to defraying the expenses of such regulation; nor that the amount collected under the ordinance was no more than was reasonably required for such a purpose. It follows that the exaction of the license fee cannot be sustained as a police measure."

The conclusion we draw from this review of the decisions of the Supreme Court of the United States is that the due-process rule is not a limitation upon the right of the state to exercise its police power unless the attempted exercise of such power is arbi-

trary or unreasonable or an improper use of such power. This seems to be the necessary conclusion from these cases.

Turning now to the instant case, we find nothing to sustain the contention that the exercise of the police power of this state, by reason of the enactments herein referred to, is arbitrary or unreasonable. Since we hold that the state of Iowa properly exercised its police power in enacting these statutes, it necessarily follows that the due-process clause of the Fourteenth Amendment of the Constitution of the United States does not restrict or limit the right of the state to exercise its police power as it did. In short, when the legislature, within proper bounds, exercises its police power, the due-process clause of the Fourteenth Amendment of the Constitution of the United States does not operate.

One other question that deserves attention is the claim that the secretary of agriculture acted fraudulently, in that the status of the record, at the time he acted on it, was such that the required number of signed agreements was not before him, to warrant his ordering the county an accredited area. With this claim we cannot agree. One of the questions which were before him to decide, at the time, was whether or not there was a sufficient number of signers to warrant his action. If the contention of the appellant is true, he erred in this respect, and nothing more. In other words, his decision was erroneous, and, so long as his decision is final,—subject only to review, if at all, by way of certiorari,—an error on his part in so deciding would not be reached by a collateral attack of this kind. No dispute is made in the case that *prima facie* there was a sufficient number of signed agreements before him to meet the requirements of the statute. This gave him jurisdiction, and the withdrawal of some of said signatures before final action would not take away such jurisdiction. *Seibert v. Lovell*, 92 Iowa 507.

We find nothing in the record which warrants a reversal.— *Affirmed.*

STEVENS, C. J., and EVANS, FAVILLE, DE GRAFF, MORLING, KINDIG, and WAGNER, JJ., concur.